**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, EX. REL. HOLLY A. ROCKEY, AS RELATOR UNDER THE FALSE CLIAMS ACT, | ) ) ) ) ) | |
| Relator/Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 11 CV 07258 |
| CHICAGO OTOLOGY GROUP, LLC; EAR INSTITUTE OF CHICAGO, LLC; RICHARD J. WIET, M.D.; ROBERT A. BATTISTA, M.D.; ARVIND KUMAR, M.D.; MARK WIET, M.D.; VASILIKE RAUCH, AU.D.; KATHLEEN HIGHHOUSE) AU.D., JILL BRODINSKI (nee MESSINA), AU.D., KRYSTINE MULLINS, AU.D.; CARLY WILLIAMS, AU.D.; AND OUR BILLING DEPARTMENT, INC. d/b/a TRELLIS HEALTH BILLING | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Judge Gary Feinerman  **JURY TRIAL DEMANDED** |
| Defendants. | ) ) | |

## SECOND AMENDED COMPLAINT
### [CORRECTED PER THE COURT'S MARCH 19, 2014 ORDER (DKT. #101)]

Plaintiff/Relator, **HOLLY ROCKEY**, by and through her undersigned attorneys,

Michael I. Leonard and Ethan E. White of Leonard Law Offices, on her own behalf and on

behalf of the **UNITED STATES OF AMERICA**, states as follows as her Second Amended

Complaint against Defendants, the **EAR INSTITUTE OF CHICAGO, LLC** ("Ear Institute")

f/k/a the Chicago Otology Group, LLC ("Chicago Otology") (hereinafter, collectively the ("Ear

Institute"); **RICHARD J. WIET, M.D.** ("DR. RICHARD WIET"), **ROBERT A. BATTISTA,**

**M.D.** ("DR. BATTISTA"); **ARVIND KUMAR, M.D.** ("DR. KUMAR"); **R. MARK WIET,**

**M.D.** ("DR. MARK WIET"); **VASILIKE RAUCH, Au.D.** ("DR. RAUCH"); **KATHLEEN**

HIGHHOUSE, Au.D. ("DR. HIGHHOUSE"); **JILL BRODINSKI** (neé MESSINA), **Au.D.** ("DR. MESSINA"); **KRYSTINE MULLINS, Au.D.** ("DR. MULLINS"); **CARLY WILLIAMS, Au.D.** ("DR. WILLIAMS"); and **OUR BILLING DEPARTMENT, INC., d/b/a TRELLIS HEALTH BILLING**, for violations of the Federal False Claims Act, 31 U.S.C. §§3729, *et. seq*. ("FCA"):

I.      **PARTIES**

1.      Defendant, **EAR INSTITUTE**, is an Illinois limited liability company that was founded in or about 1982 as the Chicago Otology Group, LLC, and was renamed the Ear Institute of Chicago, LLC in or about 2005.  The **EAR INSITUTE** is a medical and surgical practice group that devotes itself entirely to the diagnosis and treatment of disorders of the ear, facial nerves, and related structures (otology/neurotology and skull base surgery).  The **EAR INSTITUE'S** staff includes both physicians and audiologists who treat patients on a regular basis.  The **EAR INSTITUE's** three locations include: 11 Salt Creek Lane, Suite 101, Hinsdale, Illinois 60521 ("Main Office"); 800 Biesterfield Road, Suite 4001 Elk Grove Village, Illinois 60007 ("Elk Grove Village Office"); and 645 N. Michigan Avenue, Suite 401 Chicago, Illinois 60611 ("Chicago Office").

2.      At all relevant times, **DR. RICHARD WIET**, **DR. BATTISTA**, **DR. KUMAR**, and **DR. MARK WIET** (hereinafter collectively referred to as the "**PHYSICIANS**" or the "**DEFENDANT PHYSICIANS**") were physicians who were board certified to practice medicine in the State of Illinois, and were members of the **EAR INSTITUTE**.

3.      At all relevant times, **DR. RAUCH, DR. HIGHHOUSE, DR. MESSINIA, DR. MULLINS**, and **DR. WILLIAMS** (hereinafter collectively referred to as the

"**AUDIOLOGISTS**" or the "**DEFENDANT AUDIOLOGISTS**") were audiologists and employees of the **EAR INSTITUTE**.

4.      Defendant, **OUR BILLING DEPARTMENT, INC.**, d/b/a TRELLIS HEALTH BILLING (hereinafter collectively referred to as "**TRELLIS**") is an Illinois corporation with its principal place of business located at 2850 Golf Road, Suite 1000, Rolling Meadows, Illinois.  At all relevant times, **TRELLIS** transacted and was doing business in this District.

5.      Plaintiff/Relator, Holly A. Rockey ("**MS. ROCKEY**") is a citizen and resident of River Grove, Illinois.  **MS. ROCKEY** worked as a Medical Biller and Coder for the **DEFENDANTS** from approximately April 2010 until November 2010.  Although **MS. ROCKEY** worked primarily out of **DEFENDANTS'** Hinsdale Office, as the only Medical Biller and Coder for **EAR INSTITUTE**, she was responsible for and handled coding for all **EAR INSTITUTE** office locations.  **MS. ROCKEY** has direct and independent, intimate first-hand knowledge of the allegations contained herein.

## II.      JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and 31 U.S.C. §3732, which specifically confer jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§3729 and 3730.

7.      This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. §3732(a), which provides that "[a]ny action under 3730 may be bought in any judicial district in which the defendant, or in the case of multiple defendants, any one defendant can be found, resides, transacts business or in which any act proscribed in 3729 occurred."  **DEFENDANTS**, during all relevant times, resided in, transacted business in, and were doing business in, this District, and the fraudulent acts committed by them occurred within this District.

8.     Venue lies in this District pursuant to 31 U.S.C. §3732(a) and 28 U.S.C. §§1391 (b) and 1391(c) because, at all relevant times, **DEFENDANTS** were located in this District; transacted, conducted, and were doing business in this District; and all or substantially all of the acts complained of herein took place in this District.

9.     The matters alleged herein have *not* been "publicly disclosed" within the meaning of the FCA.

10.     Moreover, **MS. ROCKEY** is an "original source" within the meaning of the FCA of the allegations contained in this lawsuit.  As further set forth in detail below, pursuant to 31 U.S.C. § 3730(e)(4)(B), **MS. ROCKEY** possesses "direct and independent knowledge" within the meaning of the FCA of the information upon which the allegations contained herein are based.

11.     In addition, *prior to* ever even filing this lawsuit in this District under seal, **MS. ROCKEY**, and by and through her counsel, voluntarily provided this information to the Government by way of hand delivery to the United States Attorneys' Office for the Northern District of Illinois.  Thus, **MS. ROCKEY** voluntarily disclosed to the Government the information on which the allegations and transactions in her claims are based *before* ever even filing this action under seal in this District, in conformance with 31 U.S.C. § 3730(e)(4)(B).

12.     **MS. ROCKEY** also timely and completely provided the Government with a Disclosure of substantially all of her material evidence in conformance with 31 U.S.C. § 3730 (b)(2).

13.     Pursuant to 31 U.S.C. §3731(b)(1)(2), this FCA Complaint was initiated within the applicable statute of limitations.

III.     **FACTUAL ALLEGATIONS**

A.     **The Medicare Program**

14.     The Federal Medicare program, established under the Federal Social Security Act of 1965, provides medical services, equipment, and supplies to the aged, blind and disabled. Medicare "Part B" is a federally funded supplementary insurance program that provides insurance benefits to those who are eligible.

15.     The Centers for Medicare and Medicaid Services ("CMS") administers and supervises the Medicare Program on behalf of the United States government.

16.     For purposes of Medicare and Medicaid rules and regulations, a medical "Provider" is a health professional or organization who and provides services to eligible Medicare beneficiaries.

17.     Providers who seek reimbursement from Medicare for services provided to Medicare beneficiaries must possess both: (1) a National Provider Identification Number ("NPI") number; and (2) must be enrolled with Medicare as Providers.

18.     Medicare provides Internet and paper based manuals to Providers that include, *inter alia*, day-to-day operating instructions, policies and procedures based upon statutes and regulations, guidelines, models, and directives.  In addition, from time to time, each Medicare Provider is furnished with information regarding Medicare's rules for the billing of services.

19.     Under the Health Insurance Portability and Accountability Act, ("HIPAA"), CMS was required to adopt standards for uniform coding system for the reporting and billing of health care transactions.  In response, CMS established the Healthcare Common Procedure Coding System ("HCPCS"), which is divided into two subsystems: "Level I" and "Level II."  *See* 45 C.F.R. §§162.1002, 162.1011.  Level I is comprised of "Current Procedural Terminology"

5

("CPT"). The CPT is a uniform coding system established and maintained by the American Medical Association ("AMA"). It consists of descriptive terms and identifying codes that are used primarily to identify medical services and supplies furnished by physicians and other health care professionals. Level II is a standardized system used to identify products, supplies, and services that are not included within the CPT when used outside a physician's office.

20. The Claim Forms submitted to Medicare by Providers, including the **DEFENDANTS**, for reimbursement of medical claims are known as a "CMS-1500." These forms require the Providers, including the **DEFENDANTS**, to state truthfully and accurately, *inter alia*, the diagnosis of the patient's condition, and to provide a "HCPCS code" identifying the service(s) that were purportedly rendered by the Provider to the Medicare beneficiary.

21. As an express condition of payment, Medicare specifically requires all Providers, including the **DEFENDANTS**, to specifically certify that the services that were purportedly rendered by the Providers to the patients were actually medically necessary, as well as actually furnished by the Provider to the Medicare beneficiary. All Providers, including the **DEFENDANTS**, must also certify as an express condition of payment, *inter alia*, as to such matters as where the services were allegedly rendered and the date upon which the services or procedures were allegedly performed by the Providers.

22. Moreover, all Providers, including the **DEFENDANTS**, who participate in the Medicare program, must first expressly agree in writing as a condition of payment that they will be responsible for the truthfulness and accuracy of all claims submitted by them, or by their employees or their agents, and that all claims submitted under their Provider numbers are accurate, complete and truthful.

6

23.     Medicare also specifically requires that each Provider's signature, including the **DEFENDANTS**, be present on each and every Claim Form submitted by the Provider, the Provider's office, or the Provider's agents.  Indeed, by signing the Claim Form, the Provider expressly certifies as a condition of payment that "the services were personally furnished by me or were furnished incident to my professional services by my employee under my immediate supervision, except as otherwise expressly permitted by Medicare."

24.     Medicare also permits claims to be made electronically submitted, and permits Providers to use third-parties as their agents to submit such electronic claims.

25.     In the present case, at all relevant times and as set forth in detail below, the **DEFENDANTS** submitted their electronic claims to Medicare through their authorized agent, **DEFENDANT TRELLIS**.  More specifically, each evening, all of the **DEFENDANTS'** completed and approved claims were downloaded from the **EAR INSTITUTE'S** electronic medical records system, "eClinical," for processing and transmission by **TRELLIS** to Medicare.

26.     Medicare requires that Providers, including the **DEFENDANTS**, who submit claims or cause claims to be submitted electronically, sign an Electronic Data Interchange Agreement Form ("EDIA"), in lieu of submitting CMS-1500 Claim Forms.  The EDIA requires Providers, including the **DEFENDANTS**, to submit claims only on behalf of those Medicare beneficiaries who have given their written authorization for such method of submission, and also requires that the beneficiary's signature authorizing use of the electronic format to be on file.

27.     The EDIA further requires that Providers, including the **DEFENDANTS**, ensure that each and every electronic Claim Form is supported by an "original source document" containing the beneficiary's name, claim number, date(s) of service, diagnosis, and service performed.  This original source information must be maintained on file for at least 6 years and 3

months after the bill has been paid by Medicare. Similar to the submission of a CMS-1500

Claim Form, as an express condition of payment, with each and every electronic submission the

Providers, including the **DEFENDANTS**, must expressly certify that the services were

"performed as billed" and that the claims submitted are "accurate, complete, and truthful." *See*

CMS, Medicare Benefit Policy Manual, CMS Pub. 100-04, Chap. 24, Section 20.1.1 (Rev. 1283,

Issued: 07-06-07, Effective/Implementation: 10-01-07).

28. Each of the **DEFENDANT PHYSICIANS**, **DR. RICHARD WIET**, **DR.

BATTISTA**, **DR. KUMAR**, and **DR. MARK WIET**, executed EDIA Forms.

**B. Relevant Provisions Regarding Medicare-Covered Services**

29. Section 1861(ll)(3) of the Federal Social Security Act defines the term "audiology

services" to mean and include "such hearing and balance assessment services furnished by a

qualified audiologist as the audiologist is legally authorized to perform under State law (or the

State regulatory mechanism provided by State law), as would otherwise be covered if furnished

by a physician." Those kinds of audiology services (*i.e.* diagnostic tests) can typically be

furnished by a qualified audiologist and do not require actual physician supervision. 42 C.F.R.

410.32(b)(2)(ii). Those audiology services must, however, be billed under the NPI of the

physician or audiologist who actually performed the "audiology services" to be eligible for

reimbursement.

30. On the other hand, Medicare entirely bars the submission of claims for services

rendered and provided independently by an audiologist that are *not diagnostic*, and for

therapeutic services instead:

> There is no provision in the law for Medicare to pay audiologists for therapeutic services.
> For example, vestibular treatment, auditory rehabilitation treatment, auditory processing
> treatment, and canalith repositioning, while they are generally within the scope of
> practice of audiologists, are not those hearing and balance assessment services that are

defined as audiology services in 1861(ll)(3) of the Social Security Act and, therefore, shall not be billed by audiologists to Medicare.

*See, e.g.,* Medicare Benefit Policy Manual, at Chapter 15, Section 80.3(F).

31.     This complete bar on submission of claims extends to "[s]ervices identified as 'always' therapy in Pub. 100-04 [the Medicare Benefit Policy Manual], chapter 5, section 20 [that] may not be billed by hospitals, physicians, NPPs, or audiologists when provided by audiologists." *Id.*

32.     Medicare also entirely bars the submission of claims for "any expenses incurred for items or services 'where such expenses are for . . . hearing aids or examinations therefore. . . .'" *See* Medicare Benefit Policy Manual Chapter 16 - General Exclusions From Coverage, § 100: Hearing Aids and Auditory Implants, *citing* 42 U.S.C. 1395y(a)(7); *see also* 42 C.F.R. 411.15(d).

33.     When any evaluation and management service is a shared/split encounter between a physician and a non-physician practitioner, such as a nurse practitioner or a physician's assistant, the service can be billed under the physician's NPI number only if the service of the non-physician is considered to have been performed "incident to" the physician's services.  If "incident to" requirements have not been met for the shared/split evaluation and management services, the service must be billed under the non-physician's NPI number.

34.     As discussed above, hearing and balance assessment services may be covered as "other diagnostic tests" under Section 1861(S)(3) of the Social Security Act.  Because such services are considered "other diagnostic tests," they are <u>not</u> covered as a benefit for services rendered "incident to" a physician's service (as described in Pub. 100-02, Chap. 15, Section 80.3) ("Audiological diagnostic tests are not covered under the benefit for services incident to a

physician's service (described in Pub. 100-02, chapter 15, section 60), because they have their own benefit as 'other diagnostic tests'").

35.     Therefore, "audiological diagnostic tests" not rendered by the physician, and instead rendered by an audiologist cannot be considered to be "incident to" the physician's services and may not be billed under the name and NPI of the physician for any reason.  Instead, audiology services must be billed under the NPI of the physician or audiologist who actually performed the "audiology services" to be eligible for reimbursement.  Put another way, if the audiologist actually performed the "audiological diagnostic tests" only the audiologist may bill Medicare for reimbursement, using their own NPI number.

36.     CMS's Regulations specifically provide that, as an express condition of payment, audiologists must be enrolled as Medicare Providers and must use their own NPI numbers on the billing of all claims for services they rendered in office settings on or after October 1, 2008. CMS Pub. 100-04, Chap. 12, Section 30.3 (Rev. 2044, Issued: 09-03-10, Effective: 09-30-10, Implementation: 09-30-10).

**C.     Defendants' Submission Of False Claims And False Records**

**1.     Defendants Improperly Billed For Audiology Services That Were Performed By Non-Enrolled Audiologists**

37.     **DEFENDANTS** violated the FCA by seeking reimbursement from Medicare for "audiology services" that they falsely claimed and represented had been performed by the **DEFENDANT PHYSICIANS**, but which had actually been performed by the Audiologists who were not enrolled/registered with Medicare as Providers – and where the **DEFENDANT PHYSICIANS** who purported to have performed the services were not even present in the office and immediately available to furnish assistance.

38.     **DEFENDANTS** operated their fraudulent scheme by submitting claims to Medicare using the NPI of a **DEFENDANT PHYSICIAN**, even though a **DEFENDANT AUDIOLOGIST**, not enrolled in Medicare and *without* a valid NPI, had performed the service, and even though the **DEFENDANT PHYSICIAN** performed no services for the patient at all.

39.     Indeed, as explained in further detail below, it was not until **MS. ROCKEY** raised questions about **DEFENDANTS**' misuse of NPI numbers that **DEFENDANTS** applied to actually get NPI numbers for the various **DEFENDANT AUDIOLOGISTS**, despite knowing for at least several years that they were required to do so.

40.     The law and Regulations were knowingly and intentionally disregarded, evaded, and ignored by the **DEFENDANTS**.

**2.      In Support Of The Scheme, Defendants Created False Records and Submitted False Claims**

41.     As a matter of regular and established office practice, policy and procedure, **EAR INSTITUTE's** physicians and audiologists documented their consultations, services, and treatments with patients, including Medicare beneficiaries, by recording written patient notes.  In addition, the physician or audiologist who actually performed the consultation, services, or treatment made entries into **DEFENDANTS'** "eClinical" computerized claim system.

42.     Such entries included the names of the "Servicing Provider" and "Rendering Provider."  The "Servicing Provider" was the practitioner who actually performed the services, consultation or treatment, whereas the "Rendering Provider" was the Provider for whom reimbursement was being sought from Medicare.

43.     As a matter of regular and established office practice, policy and procedure, when services were performed by an audiologist of **EAR INSTITUTE** (whether for diagnosis, therapy, treatment, rehabilitation, or other) the audiologist who had actually performed the

services entered into eClinical his own name as both the "Servicing Provider" and the "Rendering Provider," along with other entries regarding the specific services allegedly provided.

44.     In the ordinary course of business and as part of her duties as a medical biller and coder for **EAR INSTITUTE**, using the information that had first initially been entered into the eClinical system, **MS. ROCKEY** then finalized those eClinical Claim Forms for submission to Medicare for payment.

45.     Specifically, in the ordinary course of business and in accordance with the training and instructions she received from the **DEFENDANTS**, **MS. ROCKEY** entered the CMS/Medicare billing codes for the services purportedly rendered so that **EAR INSTITUTE** could obtain reimbursement from Medicare.

46.     Additionally, in each instance where an Audiologist was entered in eClinical as the Rendering Provider (as opposed to one of the **PHYSICIAN DEFENDANTS**), **MS. ROCKEY** was instructed by the **DEFENDANTS** to change (and did so change) the Rendering Provider name on the Claim Form from the name of the **DEFENDANT AUDIOLOGIST** who had actually performed the services to the name of either **DEFENDANT DR. RICHARD WEIT** or **DR. BATTISTA** so that the claim could be submitted to Medicare for payment and/or reimbursement.

47.     **MS. ROCKEY** was trained and instructed to do so, and did so, even though the **PHYSICIAN DEFENDANT** identified, *i.e.*, **DR. RICHARD WIET** and **DR. BATTISTA** had not performed, in any part, the services, and regularly had not even been at the office when and where those services were actually performed by the **DEFENDANT AUDIOLOGISTS**.

48.     Instead, **DR. RICHARD WIET** and **DR. BATTISTA** were regularly, and for the majority of those claims, performing surgeries at other locations and/or seeing patients at other locations while those services were actually being performed by the **DEFENDANT AUDIOLOGISTS**.

49.     This, of course, enabled the **DEFENDANTS** to make more money in two ways: (1) by ignoring the law and Regulations, they were able to bill for services performed by the **DEFENDANT AUDIOLOGISTS** that could not be legally billed for in the first instance because such billings were *not* for diagnostic services and instead was for treatment, rehabilitation, "always" therapies and neurologic assessments that are not recognized by Medicare as billable when performed independently by an audiologist as in the present case (*see, e.g.,* Medicare Benefit Policy Manual, at Chapter 15, Section 80.3(F)); and (2) by not having **DR. RICHARD WEIT** and **DR. BATTISTA** present to provide assistance or direction during the times when the **DEFENDANT AUDIOLOGISTS** were in fact present and performing the services billing billed for, **DR. RICHARD WEIT** and **DR. BATTISTA** could make other monies by performing surgeries at other locations and seeing patients at other Offices.

50.     **MS. ROCKEY** was first trained by Lynn Presley, then employed as the Office Manager of **EAR INSTITUTE**, to follow these practices of changing the names.  However, all of the **DEFENDANTS** were aware of these practices, and in fact also instructed **MS. ROCKEY** to make such changes.

51.     Each evening, **TRELLIS** downloaded the completed claim information entered through **EAR INSTITUTE's** eClinical computer system.  The particular information downloaded was the information that was going to be included in the CMS 1500 Claim Forms submitted by **TRELLIS** to Medicare.  That information however, included only the above-

referenced edited Rendering Provider name, not the actual Servicing Provider's name. As such, those claims, when submitted to **TRELLIS** for submission to Medicare, falsely stated the services being billed for had actually been rendered by one of the **DEFENDANT PHYSICIANS**, and *not* by the non-enrolled Audiologist who did not even have a valid NPI, but who actually provided the services being billed to Medicare by **TRELLIS**.

52.     As **DEFENDANTS'** medical biller and coder, **MS. ROCKEY** further verified that the **DEFENDANTS' PHYSICIANS** had not actually provided the services. As part of her job duties, she reviewed the lists of all patient claims in eClinical and compared those lists to the **DEFENDANTS'** office schedules to ensure that the patients had actually been seen and provided with the services identified on the Claim Forms. From that review, she further observed that, on a regular basis where she had been required to change the Rendering Provider's name to the name of a **DEFENDANT PHYSICIAN**, that **DEFENDANT PHYSICIAN** had not even been at the particular office location of **DEFENDANTS** when the services had been rendered by the **DEFENDANT AUDIOLOGIST**, and that no **DEFENDANT PHYISICAN** at all had even been present in that location when the services had been rendered by the non-Physician.

53.     As a result, the claims submitted by and for the **DEFENDANTS** falsely described, stated, and certified (expressly and impliedly): (1) that the services had in fact been provided and rendered by one of the **DEFENDANT PHYSICIANS**, when in fact those services had actually been provided and rendered by one of the **DEFENDANT AUDIOLOGISTS**; (2) that the services were for *non-diagnostic* services that had in fact been provided and rendered by the **DEFENDANT PHYSICIANS** when, in fact, those non-diagnostic services had actually been independently performed by a **DEFENDANT AUDIOLOGIST** and were thus not billable

14

to Medicare at all; and/or (3) that the services had in fact been provided with the appropriate level of supervision required by law and the Regulations when in fact there had been no such supervision at all.

54.     The Servicing Provider listed on each Claim Form is the Provider for whom the appointment was scheduled, as well as the one who actually performed the services.  When, as described above, **MS. ROCKEY** and **DEFENDANTS'** other billers changed the Rendering Providers' names on the Claim Forms from the name of the **DEFENDANT AUDIOLOGIST** to the name of the **DEFENDANT PHYSICIAN**, **DEFENDANTS'** computer program did not permit her to change the Servicing Provider's name that appeared on a separate part of the Claim Form.  As such, for all claims in which the Servicing Provider identified is an Audiologist, those services were in fact performed by that Audiologist and were not performed by the identified Rendering Provider.

55.     Moreover, the notes entered in the patients' charts from the corresponding visits were signed by the actual Rendering Provider, providing further corroboration that it was the **DEFENDANT AUDIOLOGISTS** and *not* the **DEFENDANT PHYSICIANS** who actually performed the services for which the bills were submitted.

56.     Accordingly, **MS. ROCKEY** possesses direct and independent knowledge that the information transmitted by **DEFENDANTS** to **TRELLIS** to create the Claim Forms submitted to Medicare contained only the false and altered information, *i.e.*, the Rendering Provider's name as changed, and the billing code.

57.     Moreover, **MS. ROCKEY** also confirmed these facts with **TRELLIS** employee Parisa Zainali, such that there is no doubt that **TRELLIS**, in turn, submitted false and fraudulent claims to Medicare as part of **DEFENDANTS'** scheme.

58.     More specifically, sometime in the summer of 2010, Ms. Zainali contacted **MS. ROCKEY** telephonically after a claim for a patient was accidentally submitted by **MS. ROCKEY** to **TRELLIS** twice on the same day.  In short, **MS. ROCKEY** had submitted one of those claims under a **DEFENDANT PHYSICIAN's** name as the Rendering Provider, and one of those claims under a **DEFENDANT AUDIOLOGISTS's** name as the Rendering Provider.

59.     During that call, **MS. ROCKEY** revealed to Ms. Zainali that she had been directed by the **DEFENDANTS** to change Rendering Providers' (Audiologists') names to the names of **PHYSICIAN DEFENDANTS** despite the fact that that the services being billed to Medicare had actually been rendered by one of the **DEFENDANT AUDIOLOGISTS**.  Ms. Zainali informed **MS. ROCKEY** that **TRELLIS** was unaware that such changes had been made and that any such changes were in fact improper.

60.     However, in fact, **TRELLIS** had been submitting those very types of claims on behalf of the **DEFENDANTS** either actually knowing that they were fraudulent and/or being reckless in not knowing that they were false but intentionally failed to inquire to **DEFENDANTS** and instead "buried their head in the sand" – including by failing to make appropriate inquiry of the **DEFENDANTS**, particularly where **TRELLIS** was in the business of submitting claims to Medicare and knew and should have known of CMS's/Medicare's requirements.

61.     After **DEFENDANTS** unlawfully retaliated against **MS. ROCKEY** and fired her (*see* **MS. ROCKEY'S** Count for Retaliation below), **DEFENDANTS** sent a letter dated November 30, 2010 to "WPS Medicare Part B" in Marion, Illinois, in which they falsely claimed that they had *only recently* discovered that they had been submitting claims as described above. *See* November 30, 2010 Letter from R. Wiet to WPS Medicare Part B, hereto attached as

Plaintiff's Exhibit 18.[1]  That representation was knowingly and intentionally false.  In fact, **DEFEDANTS** (by **DEFENDANT DR. RICHARD WIET**) told **MS. ROCKEY**, prior to her termination and after she had brought their fraudulent billings practices as described specifically above to their attention, that **DEFENDANTS** engaged in those practices per the instructions of **DEFENDANTS'** accountant in order to "make more money."  Indeed, as referenced above, it was **DEFENDANTS** who specifically trained and instructed their employees to bill and submit claims in that fraudulent manner.

62.     **DEFENDANTS'** Letter to WPS Medicare Part B was most telling in what it left out – the letter did *not* disclose: (1) that the **DEFENDANTS** had falsely billed Medicare for *non-diagnostic* services actually performed and rendered by the **DEFENDANT AUDIOLOGISTS** (thus which were not even billable at all to Medicare) but which were billed as though they had been performed and rendered by the **DEFENDANT PHYSICIANS**; and (2) that those *non-diagnostic* services actually provided by the **DEFENDANT AUDIOLOGISTS** were provided in circumstances where the billing **DEFENDANT PHYSICAN** (*i.e.*, either **DR. RICHARD WEIT** or **DR. BATTISTA**) who was reported as having provided the services was not even in Office so as to be able to render assistance and direction to the **DEFENDANT AUDIOLOGISTS** actually performing those non-diagnostic services; and (3) that, in many instances, the **DEFENDANTS** did not (*see* below) even have a referral or order as required under Medicare and thus could not bill at all for the services that had been provided by the

---

[1] Based solely on those knowing and intentional misrepresentations, WPS Medicare responded to **DEFENDANT DR. RICHARD WIET** on January 14, 2011.  *See* January 14, 2011 Letter from WPS Health Insurance to R. Wiet, attached hereto as Plaintiff's Exhibit 19.  Because of those knowing and intentional misrepresentations, WPS Medicare made its decision on far from complete information.
[2] [STRICKEN PER THE COURT'S MARCH 19, 2014 ORDER (DKT. # 101)]
[3] [STRICKEN PER THE COURT'S MARCH 19, 2014 ORDER (DKT. # 101)]
[4]    The Federal HIPPA statute has a provision that specifically protects whistleblowers like **MS.**

**DEFENDANT AUDIOLOGISTS** but reported as having been provided the **DEFENDANT PHYSICIANS.**

        a. **Examples Of Specific False Records And Claims Defendants' Fraudulently Submitted to Medicare for Reimbursement**

63.     A substantial number of patients treated by the **EAR INSTITUTE** are Medicare beneficiaries. In the course of her employment at **EAR INSTITUTE**, on thousands of occasions and pursuant to the instructions and directions of the **DEFENDANTS**, in **DEFENDANTS'** eClinical Claim Forms for audiology services that were used to submit claims to Medicare, Ms. Rockey changed the Rendering Provider's name from the name of the **DEFENDANT AUDIOLOGIST** who actually provided those audiology services to the name of one of the **DEFENDANT PHYSICIANS**. Ms. Rockey further finalized those claims for submission to Trellis and in turn for submission to Medicare. Attached hereto as Exhibit 1, is a list of claims containing many that were submitted (or caused to be submitted) to Medicare by the **DEFENDANTS** in which they falsely indicated that the Rendering Provider was a **DEFENDANT PHYSICIAN** and not the **DEFENDANT AUDIOLOGIST** who had actually performed the audiology services for which Medicare was billed by the **DEFENDANTS**.

64.     During the course of her employment, **MS. ROCKEY** obtained documentation of specific instances of **DEFENDANTS'** violations of the FCA, including numerous specific instances where **MS. ROCKEY** was instructed by **DEFENDANTS** to falsely record in the Claim Forms in the eClinical system (that were used by Trellis to submit claims to Medicare).

65.     For example, on or around June 15, 2010, the **DEFENDANTS**, through **TRELLIS**, caused to be submitted a claim to Medicare for reimbursement for services that falsely claimed that **DR. RICHARD WIET** had performed the services, when in fact such services were actually provided by the **DEFENDANT AUDIOLOGIST DR. MULLINS**, who

was not registered with Medicare. Attached hereto as Exhibit 2 is the Claim Form for Patient K.W. that was created in eClinical. On Exhibit 2, the Rendering Provider on the right-hand side is listed as **DR. RICHARD WIET**; however, the Servicing Provider on the left-hand side is listed as **DR. MULLINS**. Attached hereto as Exhibit 3 are the notes from Patient K.W.'s chart that corroborate that it was **DEFENDANT AUDIOLOGIST DR. MULLINS** that performed the services and not **DEFENDANT PHYSICIAN DR. WIET**.

66.     As another example, on or around April 15, 2009, the **DEFENDANTS**, through **TRELLIS**, caused to be submitted a claim to Medicare for reimbursement for services that falsely claimed that **DR. BATTISTA** had performed the services when in fact such services were actually provided by **DEFENDANT AUDIOLOGIST DR. MESSINA**, who was not registered with Medicare. Attached hereto as Exhibit 4 is the Claim Form for Patient K.W. that was created in eClinical. On Exhibit 4, the Rendering Provider on the right-hand side is listed as **DR. BATTISTA**; however, the Servicing Provider on the left-hand side is listed as **DR. MESSINA**. Attached hereto as Exhibit 5, are the notes from Patient K.W.'s chart that corroborate that it was **DEFENDANT AUDIOLOGIST DR. BRODINSKI** (nee Messina), that actually performed the audiology services and not **DEFENDANT PHYSICIAN DR. BATTISTA**.

67.     As another example, on or around April 6, 2010, the **DEFENDANTS**, through **TRELLIS**, caused to be submitted a claim to Medicare for reimbursement for audiology services that falsely claimed that **DEFENDANT PHYSICIAN DR. BATTISTA** had performed the audiology services, when in fact such services were actually provided by the **DEFENDANT AUDIOLOGIST DR. MULLINS**, who was not registered with Medicare. Attached hereto as Exhibit 6 is the Claim Form for Patient A.S. that was created in eClinical. On Exhibit 6, the

Rendering Provider on the right-hand side is listed as **DR. RICHARD BATTISTA**; however, the Servicing Provider on the left-hand side is listed as **DR. MULLINS**.  Attached hereto Exhibit 7, are the notes from Patient A.S.'s chart that corroborate that it was **DEFENDANT AUDIOLOGIST DR. MULLINS** that performed the audiology services and not **DEFENDANT PHYSICIAN DR. BATTISTA**.

68.     As another example, on or around June 11, 2009, the **DEFENDANTS**, through **TRELLIS** caused to be submitted a claim to Medicare for reimbursement for audiology services that falsely claimed that **DEFENDANT PHYSICIAN DR. BATTISTA** had performed the audiology services, when in fact such services were actually provided by **DEFENDANT AUDIOLOGIST DR. MESSINA**, who was not registered with Medicare.  Attached hereto as Exhibit 8 is the Claim Form for Patient M.M. that was created in eClinical.  On Exhibit 8, the Rendering Provider on the right-hand side is listed as **DEFENDANT PHYSICIAN DR. BATTISTA**; however, the servicing provider on the left-hand side is listed as **DEFENDANT AUDIOLOGIST DR. MESSINA**.  Attached hereto as Exhibit 9, are the notes from Patient M.M.'s chart that corroborate that it was **DEFENDANT AUDIOLOGIST DR. BRODINSKI** (nee Messina) that performed the audiology services and not **DEFENDANT PHYSICIAN DR. BATTISTA**.

69.     Similar records proving thousands of other instances where the **DEFENDANTS** falsely claimed that a physician **DEFENDANT** was the Rendering Provider when in fact it was one of the **DEFENDANT AUDIOLOGISTS** who rendered audiology services billed to Medicare by the **DEFENDANTS** are in the exclusive possession and control of the **DEFENDANTS**.

70.     **DEFENDANTS** had specific knowledge of these illegal, fraudulent, and improper practices.  Indeed, **DEFENDANTS** instructed and trained **MS. ROCKEY** to make the changes in eClinical knowing that the **DEFENDANT PHYSICIANS** were not the Rendering Providers and that such false claims would be submitted to Medicare.

71.     Moreover, Ms. Rocky discussed the impropriety of this practice with the **DEFENDANT PHYSICIANS** and the **DEFENDANT AUDIOLOGISTS**, and even memorialized the impropriety of these practices in an email to certain of the Defendants on October 28, 2010.  *See* Exhibit 10, October 28, 2010 Rockey Email, attached hereto.

### 3.     Other Examples Of False Records And Claims

72.     These instances of false records and payment claims extended beyond the kind of diagnostic tests normally covered by an Audiologist through Medicare (if billed under their own NPI).  Indeed, **DEFENDANT AUDIOLOGISTS** were actually performing therapeutic services prohibited for payment under Medicare *unless* provided by a physician.

73.     For example, **DEFENDANT AUDIOLOGISTS** regularly performed auditory rehabilitation treatments, auditory processing treatments, and other forms of therapy on patients – they very kind of therapeutic services prohibited for payment under Medicare *unless* provided by (and billed under) a physician.

74.     To get around that regulatory requirement, **DEFENDANTS** instructed and trained **MS. ROCKEY** to make the changes in eClinical so that therapeutic and other work actually performed by **DEFENDANT AUDIOLOGISTS** would be reported and submitted as having been provided by **DEFENDANT PHYSICIANS**.

75.     During the course of her employment, **MS. ROCKEY** witnessed, on a regular basis, **DEFENDANT AUDIOLOGISTS** discussing specific instances of providing prohibited

21

therapeutic services to patients. These conversations would take place between the

**DEFENDANT AUDIOLOGISTS** in the cafeteria of the Defendants' Hinsdale office.

76.     On many occasions, **MS. ROCKEY** would hear **DEFENDANT**

**AUDIOLOGISTS** discussing therapy sessions with patients to increase hearing, and improve

patient benefit from cochlear implants. Those therapy sessions would <u>not</u> be billed under the

**DEFENDANT AUDIOLOGISTS**'s non-existent NPI numbers, but were instead changed by

**MS. ROCKEY** to reflect that the service was performed by a **DEFENDANT PHYSICIAN**,

using the same fraudulent scheme as she had been trained to apply to instances where a claim

was submitted for work done by a **DEFENDANT AUDIOLOGIST** but with a **DEFENDANT**

**PHYSICIANS'** NPI.

77.     Although **MS. ROCKEY** was able to take, prior to her abrupt suspension and

subsequent termination, a substantial number of documents from **DEFENDANTS'** Office that

document, memorialize, and corroborate her claims of these falsely billed therapeutic treatments,

she was not able to take the eClinical Progress Notes, Claims data in **DEFENDANT**'s system, or

the daily schedules that demonstrate **DEFENDANT AUDIOLOGISTS** were unlawfully

rendering services that Medicare prohibits and then billing Medicare as if **DEFENDANT**

**PHYSICIANS** had performed those services. Those documents are in **DEFENDANTS'** sole

possession, custody, and control.

        **4.**    **Defendants Improperly Billed Medicare For "Additional Services"**
                 **Under A Defendant Physician's NPI Number When The Services**
                 **Were Actually Rendered By A Defendant Audiologist**

78.     In instances where a **DEFENDANT PHYSICIAN** actually performed some

covered services with respect to Medicare beneficiaries, the **DEFENDANT PHYSICIANS**

frequently directed a **DEFENDANT AUDIOLOGIST** to perform additional covered services,

either prior to or after meeting with the patient. These additional services however, were not

billed under the **DEFENDANT AUDIOLOGISTS'** NPI numbers as required by Medicare but rather were billed under the **DEFENDANT PHYSICIANS'** NPI numbers.

79. Moreover, the services performed by the **DEFENDANT AUDIOLOGISTS**, but billed as if they had been performed by the **DEFENDANT PHYSICIANS**, were improper for another reason. It was the practice, policy and procedure for the **DEFENDANT AUDIOLOGISTS** to perform services that were not the result of a physician referral as required by Medicare.

80. For instance, although the **DEFENDANT PHYSICIANS** never performed audiology tests, where an audiology test was performed by a **DEFENDANT AUDIOLOGIST** in the same office visit where a **DEFENDANT PHYSICIAN** provided other services, the **DEFENDANT PHYSICIANS** falsely indicated on the eClinical Claim Forms (that were then used by **TRELLIS** to create and submit claims for reimbursement to Medicare) that the **DEFENDANT PHYSICIAN** had in fact performed such audiology tests.

81. In such instances, the Physicians initiated the creation of a claim in eClinical for the office visit listing themselves as the sole Rendering Provider for all of the services provided to the beneficiary during the office visit. When the **DEFENDANT AUDIOLOGIST** performed additional covered services for the Medicare beneficiary, at the request of, and with the knowledge of the **DEFENDANT PHYSICIANS**, the **DEFENDANT AUDIOLOGISTS** added those additional services to the Claim Form created by the **DEFENDANT PHYSICIAN** (for the services actually rendered by the Physician) in eClinical, rather than creating a separate Claim Form for those additional services.

82. In such instances, the Defendants failed to distinguish between those services performed by the **DEFENDANT AUDIOLOGIST** from those performed by the **DEFENDANT**

**PHYSICIAN** and instead claimed that the **DEFENDANT PHYSICIAN** had performed all of the billed services. As a result, the eClinical Claim Forms falsely described and stated that all of the services for that particular patient visit were performed by the **DEFENDANT PHYSICIAN** when the additional services had actually been performed by the **DEFENDANT AUDIOLOGIST**.

83. Attached hereto as Exhibit 11,[2] are billing summaries for claims submitted (or caused to be submitted) by **DEFENDANTS** to Medicare in which audiology tests that were performed by a **DEFENDANT AUDIOLOGIST** were billed as if they had been performed by **DEFENDANT PHYSICIAN DR. BATTISTA** in conjunction with other services that were actually rendered by him. Specifically, audiological tests and screenings such as those listed on the billing summary as "Audio Comprehensive," were performed by a **DEFENDANT AUDIOLOGIST** rather than **DEFENDANT DR. BATTISTA**, but were billed to Medicare as if **DR. BATTISTA** had performed them. **MS. ROCKEY** was aware that these tests were not in fact performed by **DEFENDANT PHYSICIAN DR. BATTISTA** because the physicians never performed such tests at the Ear Institute. Each patient's notes accurately reflect who actually performed the tests or procedures. Those notes are in the possession and control of the Ear Institute.

84. Attached hereto as Exhibit 12, is a billing summary of a claim submitted to Medicare in which audiology tests that were performed by a **DEFENDANT AUDIOLOGIST** were billed as if they had been performed by **DEFENDANT PHYSICIAN DR. KUMAR**, in conjunction with other services rendered by **DR. KUMAR**. Specifically, audiological tests and screenings such as those listed on the billing summary as "Audio Comprehensive," were performed by a **DEFENDANT AUDIOLOGIST** rather than **DEFENDANT PHYSICIAN DR.**

---

[2] [STRICKEN PER THE COURT'S MARCH 19, 2014 ORDER (DKT. # 101)]

KUMAR. **MS. ROCKEY** was aware that these tests were not in fact performed by

**DEFENDANT PHYSICIAN DR. KUMAR** because the **DEFENDANT PHYSICIANS** never

performed such tests at the Ear Institute.

85.     [STRICKEN PER THE COURT'S MARCH 19, 2014 ORDER (DKT. # 101)].[3]

86.     On certain occasions, a Physician would "lock" the claim before the audiologist

was able to add the additional services to that claim.  In those instances, the audiologist would

email Ms. Rockey requesting that the additional charges be added to the **DEFENDANT**

**PHYSICIAN'S** claim even though the services were actually performed by the audiologist.  *See,*

*e.g.*, November 2, 2010 Highhouse Email, hereto attached as Plaintiff's Exhibit 16.  On hundreds

of occasions, pursuant to her training and instructions by the **DEFENDANTS**, **MS. ROCKEY**

added claims for such additional services that were actually performed by the **DEFENDANT**

**AUDIOLOGISTS**, and she prepared them for submission to Medicare through Trellis as if such

claims had been performed by one of the **DEFENDANT PHYSICIANS**.

87.     For example, on November 2, 2010, **DEFENDANT AUDIOLOGIST DR.**

**HIGHHOUSE** emailed **MS. ROCKEY** requesting that **MS. ROCKEY** add to a claim (for

billable services provided **DR. RICHARD WIET** only), a charge for an audiogram that **DR.**

**HIGHHOUSE** had performed.  *See* Exhibit 16*;* [STRICKEN PER THE COURT'S MARCH 19,

2014 ORDER (DKT. # 101)].

88.     **MS. ROCKEY** has direct and independent knowledge of this improper practice

as she was required by the **DEFENDANTS** to review each claim as well as add audiology

charges to the **DEFENDANT PHYSICIANS'** claims where the **DEFENDANT**

**AUDIOLOGISTS** failed to timely enter them.

89.     **DEFENDANTS** had specific knowledge of this improper practice.  Not only did

---

[3] [STRICKEN PER THE COURT'S MARCH 19, 2014 ORDER (DKT. # 101)]

**MS. ROCKEY** discuss the impropriety of this practice with the **DEFENDANTS**, she also memorialized it in an email to **DEFENDANTS** on or about October 28, 2010.

> **5.    Defendants Improperly Submitted Claims For Services Without A Referral Or Doctor's Order From The Referring Physician**

90.    **DEFENDANTS** violated the FCA by seeking reimbursement from Medicare for audiology services that the **DEFENDANT AUDIOLOGISTS** performed without an actual referral or order from an independent physician.

> **a.    Relevant Medicare Regulations**

91.    Section 80.3(B) of the Medicare Benefit Policy Manual provides that if "a beneficiary undergoes diagnostic testing performed by an audiologist without a physician order, the tests are not covered, even if the audiologist discovers a pathologic condition."  *See* Centers for Medicare and Medicaid Services, Medicare Benefit Policy Manual, Chap. 15, Section 80.3 (Rev. 132, Issued: 09-03-10, Effective/Implementation: 9-30-10).

92.    Section 80.6.1 defines an order as "a communication from the treating physician/practitioner requesting that a diagnostic test be performed."  It also provides that an order may be delivered via the following forms of communication: a written document signed by the treating physician/practitioner; a telephone call by the treating physician/practitioner or his/her office to the testing facility; and an electronic mail by treating physician/practitioner or his/her office to the testing facility."  *See* Centers for Medicare and Medicaid Services, Medicare Benefit Policy Manual, Chap. 15, Section 80.6.1 (Rev. 94, Issued: 08-29-08, Effective/Implementation: 01-01-03).

93.    Section 80.6.1 further provides that, if the order is communicated telephonically, then the testing facility must document the call in the beneficiary's medical records.  Although the order "is not required to be signed, the physician must clearly document, in the medical

26

record, his or her intent that the test be performed." *Id.*

> **b.** **Defendants Submitted False Claims To Medicare For Services Performed Without A Physician's Order**

94.     The **DEFENDANT AUDIOLOGISTS** performed audiological tests for both patients of the **DEFENDANT PHYSICIANS**, as well as for outside patients who were not already patients of the **DEFENDANT PHYSICIANS**.

95.     Where the patient/beneficiary was such an outside patient, he/she would call and request an appointment directly with one of the **DEFENDANT AUDIOLOGISTS**.  In the ordinary course of business and as a matter of Office practice, policy, and procedure, the **EAR INSTITUTE** did *not* require or request any referral or physician's order at all before scheduling that appointment.

96.     Moreover, in the ordinary course of business and as a matter of Office practice, policy and procedure, no notes were made on the outside of the patients' charts or records in those situations indicating that the treatment rendered and provided by the **DEFENDANT AUDIOLOGISTS** was pursuant to a physician's order or referral – because they were not.

97.     Despite having no physician's order or a referral, the **DEFENDANT AUDIOLOGISTS** regularly performed the requested audiological tests.  The **DEFENDANTS** then submitted claims for payment to Medicare in which they billed for the services provided, knowing (or being reckless in not knowing) that there had never been any physician's order or referral in the first instance – and, of course, as described above, falsely billing for those services as if they had been performed by a **DEFENDANT PHYSICIAN** when in fact they had actually been performed by a **DEFENDANT AUDIOLOGIST**.

98.     All such claims were false and fraudulent because **DEFENDANTS** could not bill, in the first instance, for any such services where no order or referral had been provided, and

further because the **DEFENDANTS** claimed that the **DEFENDANT PHYSICIANS** had

rendered and performed such services when in fact they had actually been performed by a

**DEFENDANT AUDIOLOGIST**.

99.     Although **MS. ROCKEY** was able to take, prior to her abrupt suspension and

subsequent termination, a substantial number of documents from **DEFENDANTS'** Office that

document, memorialize, and corroborate her claims in this action, she was not able to take the

patient files that document each and every instance where the **DEFENDANTS** unlawfully

rendered services without a referral or order and then billed Medicare as if they had.  The records

demonstrating **DEFENDANTS'** fraudulent submissions are in the sole possession, custody, and

control of the **DEFENDANTS**.

100.    Those files document and corroborate this claim (*i.e.*, services provided without

an order or referral) because they reveal, by way of the absence of any referring physician order

or referral, the specific patients who were provided services without such an order or referral.

Indeed, in all instances in which **DEFENDANTS** lawfully provided services after the receipt of

an order or referral, that information is specifically notated within or on the patient's file and

associated notes and entries.

101.    Those files and records in the **DEFENDANTS'** sole possession and control

further provide the specific dates upon which such unlawful services were performed and

rendered without an order or referral as well as the specific services for which **DEFENDANTS**

improperly billed Medicare – and the amounts of all such fraudulent billings.

**D.      The Defendants Terminated Ms. Rockey In Retaliation For Her Protected
          Activity**

102.    On or about October 26, 2010, during an Office meeting, **MS. ROCKEY**

informed the **DEFENDANT PHYSICIAN**S that they had been submitting false claims for

payment to Medicare.  In response, the **DEFENDANTS** acknowledged and admitted to **MS. ROCKEY** that they were well aware that their actions were improper, explaining that they had been submitting those fraudulent claims at the suggestion of their accountant because it would allow them to collect more money from Medicare.  The **DEFEFNDANTS** instructed and directed **MS. ROCKEY** to continue submitting false claims in this manner, despite her expressed concerns.

103.    On or about October 28, 2010, **MS. ROCKEY** sent an email to the **DEFENDANTS**, again outlining the proper and lawful procedure for billing Medicare for audiology services.

104.    Just days later, **MS. ROCKEY** was instructed by **DEFENDANT DR. RAUCH** to begin training another current employee to perform **MS. ROCKEY'S** job duties under the pretext that the other employee would fill in for **MS. ROCKEY** when she was on vacation.

105.    **MS. ROCKEY** asked **DR. RICHARD WIET**, **DR. BATTISTA**, and **DR. RAUCH** whether she should "train her [the other employee] the right way or the wrong way?" In response, **DR.RAUCH** instructed **MS. ROCKEY** to train the employee to create the fraudulent billing records in the same manner that **DEFENDANTS** had trained and instructed **MS. ROCKEY**.

106.    Shortly thereafter, **MS. ROCKEY** received two bogus and wholly pretextual and retaliatory write-ups.  The first one was for alleged tardiness during the previous week, and the second one was for allegedly failing to mail four overpayments to patients – a task that was not part of **MS. ROCKEY'S** job duties at that time.

107.    Following those pretextual write-ups, **DR. BATTISTA**, out of the blue, told that **MS. ROCKEY** that she was suspended without pay.  **DR. BATTISTA** refused however, to

explain or provide any reason for that suspension – nor was there any legitimate, non-pretextual and non-retaliatory basis for that suspension.

108.     **DR. BATTISTA** immediately escorted **MS. ROCKEY** out of **DEFENDANTS'** Office.  Tellingly, **DR. BATTISTA** informed **MS. ROCKEY** that her suspension from her employment was because of her "conflict of interest" with the **DEFENDANTS**, *i.e.*, that she was opposed to their illegal billing practices.

109.     **DEFENDANTS'** bizarre and unlawful campaign of retaliation against **MS. ROCKEY** was far from over.

110.     Shortly after her baseless suspension and during the evening hours, a Hinsdale Police Officer "visited" **MS. ROCKEY** at her then residence in Oak Park, Illinois, well outside of that officer's jurisdiction.

111.     That Officer gained entry to the area outside the entrance to **MS. ROCKEY'S** apartment door after somehow entering into the building's locked common entrance without ringing **MS. ROCKEY'S** buzzer or otherwise asking permission to enter the building.

112.     When **MS. ROCKEY** answered the Officer's knock on her apartment door, he aggressively demanded that **MS. ROCKEY** immediately turn over all papers belonging to **DEFENDANTS** and, without a warrant (which **MS. ROCKEY** demanded he provide, but without success), he then attempted to force his way into **MS. ROCKEY'S**  home.

113.     Furthermore, that Hinsdale Police Officer threatened **MS. ROCKEY**, telling her that if she did not turn over all of the papers belonging to the **DEFENDANTS**, he would make things difficult for her and her young son – who lived with **MS. ROCKEY** in the apartment.

114.     Despite her obvious fear, **MS. ROCKEY** refused to give in to the Officer's threats and was able to close her door.

115.   **MS. ROCKEY** immediately called several third parties in an attempt to protect the documents and records that she had in her possession, which documented **DEFENDANTS'** illegal billing practices.

116.   One of those third parties sent a messenger to **MS. ROCKEY** to retrieve and safeguard the records.[4]

117.   Approximately two weeks later, the **EAR INSTITUTE** sent **MS. ROCKEY** a letter informing her that she had been terminated from her position.

118.   **DEFENDANTS'** retaliatory termination of **MS. ROCKEY** was the direct and proximate result of her engaging in protected activity under the FCA, including her attempts to get the **DEFENDANTS** to cease their illegal activities.

119.   There was no any legitimate, non-pretextual and non-retaliatory basis for the termination of **MS. ROCKEY'S** employment.

## **COUNT ONE**

### **(All Defendants - Violations of the False Claims Act 31 U.S.C. §3729(a)(1)(A))**

120.   **MS. ROCKEY** incorporates by reference the allegations of Paragraphs 1 through 119 as if fully set forth herein as Paragraph 120 of Count One.

121.   **MS. ROCKEY** seeks relief against the **DEFENDANTS** on behalf of the Government in the form of compensatory damages, treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended.

122.   As alleged above, **DEFENDANTS** knowingly and intentionally, or acting with

---

[4]   The Federal HIPPA statute has a provision that specifically protects whistleblowers like **MS. ROCKEY** and allows them to take documents and records that would otherwise be protected in order to allow them to report fraud.  In other words, **MS. ROCKEY** had obviously done nothing wrong and the **DEFENDANTS** were not in any justified or privileged in enlisting a police officer, well outside of his jurisdiction, and friendly to **DEFENDANTS** to attempt to intimidate her and possibly impede her efforts at blowing the whistle on the **DEFENDANTS**.  *See* 45 C.F.R. 164.502; 45 C.F.R. 164.504(j)(1)(i).

deliberate ignorance or with reckless disregard for the truth, presented or caused to be presented, false or fraudulent claims for payment or approval in connection with submission of medical claims and requests for reimbursement under the Medicare program.

123.    The United States and/or its fiscal intermediaries paid the false and fraudulent claims submitted by the **DEFENDANTS** under the Medicare program due to the **DEFENDANTS'** illegal conduct.

124.    As a direct and proximate result of **DEFENDANTS'** illegal and fraudulent conduct as described above, the United States has been damaged in a substantial amount to be determined at trial.

## COUNT TWO

### (All Defendants - Violations of the False Claims Act 31 U.S.C. §3729(a)(1)(B))

125.    **MS. ROCKEY** incorporates by reference the allegations of Paragraphs 1 through 119 as if fully set forth herein as Paragraph 125 of Count Two.

126.    **MS. ROCKEY** seeks relief against the **DEFENDANTS** on behalf of the Government in the form of compensatory damages, treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended.

127.    As set forth above, **DEFENDANTS** knowingly and intentionally, or acting in deliberate ignorance or in reckless disregard for the truth, made, used and caused to be made and used, false records and statements material to false or fraudulent claims in connection with the submission of false claims for reimbursement under the Medicare Program.

128.    The United States and/or its fiscal intermediaries paid such false or fraudulent claims due to illegal and fraudulent acts and conduct of the **DEFENDANTS**.

129.    As a direct and proximate result of **DEFENDANTS'** illegal and fraudulent

conduct as described above, the United States has been damaged in a substantial amount to be determined at trial.

## COUNT THREE

**(All Defendants - Violations of the False Claims Act 31 U.S.C. §3729(a)(1)(C))**

130.    **MS. ROCKEY** incorporates by reference the allegations of Paragraphs 1 through 119 as if fully set forth herein as Paragraph 130 of Count Three.

131.    The **DEFENDANTS** conspired with each other to commit violations of 31 U.S.C. §3729(a)(1)(A) and 31 U.S.C. §3729(a)(1)(A).

132.    Each of the **DEFENDANTS** agreed with each other to submit false claims and create false records that as further set forth above.

133.    **MS. ROCKEY** is aware of that agreement because she was told by the **DEFENDANTS** that the members of the **EAR INSTITUTE** had intentionally agreed and decided to create records and submit claims in this manner.

134.    As described above, one or more of the **DEFENDANTS** performed acts in furtherance of that agreement to create false records and to submit false claims.

135.    Accordingly, **MS. ROCKEY** seeks relief against the **DEFENDANTS** on behalf of the Government in the form of compensatory damages, treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended.

136.    The United States and/or its fiscal intermediaries paid such false or fraudulent claims due to the illegal and fraudulent acts and conduct of the **DEFENDANTS**.

137.    As a direct and proximate result of **DEFENDANTS'** illegal and fraudulent conduct, the United States has been damaged in a substantial amount to be determined at trial.

## COUNT FOUR

**(All Defendants - Violations of the False Claims Act 31 U.S.C. § 3729(a)(1)(G))**

138.    **MS. ROCKEY** incorporates by reference the allegations of Paragraphs 1 through 119 as if fully set forth herein as Paragraph 138 of Count Four.

139.    **MS. ROCKEY** seeks relief against the **DEFENDANTS** on behalf of the Government in the form of compensatory damages, treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended.

140.    As set forth above, **DEFENDANTS** knowingly and intentionally, or acting in deliberate ignorance or in reckless disregard for the truth, made, used and caused to be made and used, materially false records and statements in order to conceal, avoid, or decrease their obligation to pay monies to the Government that they owed to it.  In other words, **DEFENDANTS** submitted "reverse false claims" and violated the "reverse false claims" provisions of the FCA.

141.    Here, as set forth above, **DEFENDANTS** attempted to avoid their obligations to paying/re-paying monies that they were obligated to pay/re-pay to the Government in at least two ways: (1) by way of the fraudulent letter they sent in November 2010 in which they intentionally and fraudulently misrepresented their conduct affirmatively and by omission, and (2) by way of all of their submissions for payment of claims because they failed to take out or reimburse the Government for prior false claims that they submitted and for which the Government made payment to them.

142.    As a direct and proximate result of **DEFENDANTS'** illegal and fraudulent conduct as described above, the United States has been damaged in a substantial amount to be determined at trial.

34

<u>**COUNT FIVE**</u>

**(Defendants Ear Institute, Chicago Otology Group, Dr. Richard Wiet, Dr. Battista, Dr. Kumar, and Dr. Mark Wiet - Violations of the False Claims Act 31 U.S.C. §3730(h))**

143.    **MS. ROCKEY** incorporates by reference the allegations of Paragraphs 1 through 119 as if fully set forth herein as Paragraph 143 of Count Five.

144.    As a direct and proximate result of her efforts and lawful acts to stop violations of the FCA, **DEFENDANTS** discharged, suspended, threatened, harassed and otherwise retaliated and discriminated against **MS. ROCKEY** in the terms and conditions of her employment.

145.    **DEFENDANTS'** actions constituted illegal retaliation as specifically prohibited by the FCA's anti-retaliation provisions.

146.    **MS. ROCKEY** has been damaged by the **DEFENDANTS'** above-described illegal and retaliatory conduct in an amount to proven at trial, including, but not limited to lost wages, benefits, emotional distress, punitive damages, and attorneys' fees.

<u>**COUNT SIX**</u>

**(Defendants Ear Institute, Chicago Otology Group, Dr. Richard Wiet, Dr. Battista, Dr. Kumar, and Dr. Mark Wiet – Illinois Common Law Retaliatory Discharge)**

147.    **MS. ROCKEY** incorporates by reference the allegations of Paragraphs 1 through 119 as if fully set forth herein as Paragraph 147 of Count Six.

148.    As a direct and proximate result of her efforts and lawful acts to stop violations of the FCA, **DEFENDANTS** suspended and then discharged **MS. ROCKEY** from her employment.

149.    **DEFENDANTS'** retaliatory actions violated a clearly mandated public policy and therefore constitute tortious common-law retaliation as prohibited by Illinois law.

150.     As a direct and proximate result of **DEFENDANTS'** retaliatory acts, **MS. ROCKEY** has been damaged in an amount to be proven at trial, including, but not limited to lost wages, benefits, emotional distress, attorneys' fees, and punitive damages.

**WHEREFORE,** for the reasons set forth above, Plaintiff/Relator, **MS. ROCKEY**, for herself and on behalf of the United States respectfully requests that this Court and/or the finder of fact enter judgment in her favor and against the **DEFENDANTS** as follows:

a.     An Order requiring the **DEFENDANTS** to cease their violations of the FCA;

b.     An Order entering judgment in favor of the United States and **MS. ROCKEY** and against the **DEFENDANTS** in an amount equal to three times the actual damages the United States has sustained a result of **DEFENDANTS'** actions, as well as a civil penalty for each and every violation of the FCA in the amount of $11,000;

c.     An Order entering judgment in favor of **MS. ROCKEY** and against the **DEFENDANTS** in the amount of compensatory and punitive damages suffered because of **DEFENDANTS'** violations of the FCA's anti-retaliation provisions and its tortious retaliatory discharge under Illinois common law, as well as her attorneys' fees and costs;

d.     An Order awarding to **MS. ROCKEY** the maximum amount allowed as a "Relator's Share" pursuant to §3730(d) of the Federal False Claims Act;

e.     An Order awarding to **MS. ROCKEY** and from the **DEFENDANTS** all reasonable expenses that were necessarily incurred, plus reasonable attorneys' fees and costs;

f.     An Order awarding to **MS. ROCKEY** and from the **DEFENDANTS** all damages

caused by **DEFENDANTS** for **MS. ROCKEY'S** emotional distress; and

g.      An Order awarding to the United States and **MS. ROCKEY** all such other relief

as the Court may deem just and proper.

**PLAINTIFFS DEMAND TRIAL BY JURY**

[CORRECTED PER THE COURT'S MARCH 19, 2014 ORDER (DKT. #101) on MARCH 21, 2014]

Dated: February 17, 2014                    RESPECTFULLY SUBMITTED,

By: /s/ Michael I. Leonard
        Michael I. Leonard
        Ethan E. White
        LEONARD LAW OFFICES
        203 North LaSalle, Suite 1620
        Chicago, Illinois 60601
        (312) 380-6559 (direct)
        mleonard@leonardlawoffices.com
        ewhite@leonardlawoffices.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on February 17, 2014 a true and correct copy of the foregoing *Second Amended Complaint* was sent, via electronic mail, to the addresses listed on Northern District of Illinois's CM/ECF system for all counsel of record.

RESPECTFULLY SUBMITTED,

By: /s/ Ethan E. White
    Ethan E. White
    LEONARD LAW OFFICES
    203 North LaSalle, Suite 1620
    Chicago, Illinois 60601
    (312) 380-6634
    ewhite@leonardlawoffices.com