UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* HOLLY A. ROCKEY, <br><br> Relator/Plaintiff, <br><br> vs. <br><br> EAR INSTITUTE OF CHICAGO, LLC, RICHARD J. WIET, ROBERT A. BATTISTA, ARVIND KUMAR, MARK WIET, VASILIKE RAUCH, KATHLEEN HIGHHOUSE, JILL BRODINSKI, KRYSTINE MULLINS, CARLY WILLIAMS, OUR BILLING DEPARTMENT, INC., d/b/a TRELLIS HEALTH BILLING, and CHICAGO OTOLOGY GROUP, LLC, <br><br> Defendants. | 11 C 7258 <br><br> Judge Feinerman |

## <u>Memorandum Opinion and Order</u>

Having uncovered what she believed to be Medicare fraud, Holly Rockey brought this

*qui tam* suit against her former employer and all nine of its doctors and audiologists (collectively,

"Ear Institute Defendants"), as well as its billing contractor ("Trellis"), under the False Claims

Act ("FCA"), 31 U.S.C. § 3729 *et seq.*  Doc. 102.  Rockey also claims that the Ear Institute and

its doctors fired her in retaliation for having exposed the alleged fraud, in violation of the FCA

and Illinois law.  *Ibid.*  Eighteen months after Rockey filed this suit, the United States declined to

intervene and the Chief Judge unsealed the complaint.  Docs. 11-13.  Months later, Rockey

sought and obtained leave to file an amended complaint.  Docs. 45, 48-49.  Faced with a motion

to dismiss, Doc. 62, Rockey sought and obtained leave to file a second amended complaint,

Docs. 80, 83, 86, 102.  In allowing Rockey to file the second amended complaint, the court

stated on the record that it would be Rockey's last chance to amend.

Ear Institute Defendants and Trellis have separately moved under Federal Rule of Civil Procedure 12(b) to dismiss the second amended complaint.  Docs. 103, 105.  Trellis's motion is granted, while Ear Institute Defendants' motion is granted in part and denied in part.

**Background**

On a motion to dismiss under Rule 12(b)(6), the court must accept the operative complaint's well-pleaded factual allegations, with all reasonable inferences drawn in Rockey's favor, but not its legal conclusions.  *See Munson v. Gaetz*, 673 F.3d 630, 632 (7th Cir. 2012).  The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Rockey's briefs opposing dismissal, so long as those additional facts "are consistent with the pleadings."  *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).  The facts are set forth as favorably to Rockey as those materials permit. *See Gomez v. Randle*, 680 F.3d 859, 864 (7th Cir. 2012).

The Ear Institute employs several physicians and audiologists who "diagnos[e] and treat[] disorders of the ear, facial nerves, and related structures."  Doc. 102 at ¶ 1.  Many of its patients are eligible for Medicare.  *Id*. at ¶ 63.  From April 2010 until her termination in November 2010, Rockey worked as a "medical biller and coder" at the Ear Institute.  *Id*. at ¶ 5.  Among Rockey's duties was to enter data, including Medicare billing codes, into patient claims forms stored in "eClinical," the Ear Institute's electronic medical records system.  *Id*. at ¶¶ 44-45.  Each evening the Ear Institute's billing contractor, Our Billing Department, Inc., d/b/a Trellis Health Billing, downloaded the information from eClinical and prepared official claims forms (either "CMS 1500" paper forms or their electronic equivalents) for submission to Medicare for reimbursement.  *Id*. at ¶¶ 25, 51.

The eClinical forms had several fields, including "Servicing Provider" and "Rendering Provider." *Id*. at ¶ 42. During Rockey's tenure at the Ear Institute, if an audiologist performed services for a patient, he would enter his own name in both fields, but before releasing the data to Trellis for submission to Medicare, Rockey would—per Ear Institute Defendants' instructions— change the "Rendering Provider" from the name of the audiologist to that of a physician, even if the physician had not performed any service listed on the form. *Id*. at ¶¶ 43-47. Trellis then would download from eClinical only the name of the Rendering Provider, not the Servicing Provider, and so only the physician's name and National Provider Identification number ("NPI") would appear on the forms Trellis submitted to Medicare on the Ear Institute's behalf. *Id*. at ¶ 51. In fact, the Ear Institute's audiologists had not even enrolled as Medicare providers, and so did not have their own NPIs, despite a Medicare regulation stating that "[a]udiologists must be enrolled and use their NPI on claims for services they render in office settings on or after October 1, 2008 …." Centers for Medicare & Medicaid Services, *Medicare Claims Processing Manual*, Pub. 100-04, at ch. 12, § 30-3(A)(2); *see* Doc. 102 at ¶¶ 36, 51.

To be reimbursable, medical services for eligible patients ordinarily must be furnished by a physician or, if by a non-physician, "under [an] appropriate level of supervision by a physician." 42 C.F.R. § 410.32; *see* Doc. 102 at ¶ 29. Medicare does, however, cover diagnostic audiology services "personally furnished by a qualified audiologist" even without physician supervision—albeit with some limitations. Centers for Medicare & Medicaid Services, *Medicare Benefit Policy Manual*, Pub. 100-02, at ch. 15, § 80.3(A); *see* Doc. 102 at ¶ 29; 42 C.F.R. § 410.32(b)(2)(ii). One limitation is that a physician must order the service; diagnostic audiology services "performed by an audiologist without a physician order … are not covered." *Medicare Benefit Policy Manual*, *supra*, at ch. 15, § 80.3(B); *see* Doc. 102 at ¶ 91. In addition,

"[t]here is no provision in the law for Medicare to pay audiologists for therapeutic services," as distinct from diagnostic services, even though some therapeutic services may be covered if administered directly by a physician. *Medicare Benefit Policy Manual*, *supra*, at ch. 15, § 80.3(F); *see* Doc. 102 at ¶ 30. Not only did the Ear Institute regularly present reimbursement claims to Medicare for services rendered by an audiologist using a physician's name and NPI, but some of those services were either therapeutic services or performed without a physician order—meaning that but for the false listing of the physician's NPI, Medicare would not have reimbursed the Ear Institute for the services. Doc. 102 at ¶¶ 53, 69, 72-76, 97-98.

Sometime in Summer 2010, Rockey told a Trellis employee that, on Ear Institute Defendants' instructions, she had been changing the names in the Rendering Provider field on claims forms from that of the treating audiologist to that of a physician. *Id*. at ¶¶ 58-59. The Trellis employee said that Trellis "was unaware that such changes had been made and that any such changes were in fact improper." *Id*. at ¶ 59.

In an October 26, 2010 office meeting, Rockey alerted Ear Institute Defendants to their improper billing practices. *Id*. at ¶ 102. Ear Institute Defendants "acknowledged and admitted to [Rockey] that they were well aware that their actions were improper," yet "instructed and directed [her] to continue submitting … claims in this manner," *ibid*., and to train another employee to do the same, *id*. at ¶ 104-05. Ear Institute Defendants told Rockey that they had adopted that billing approach "at the suggestion of their accountant because it would allow them to collect more money from Medicare." *Id*. at ¶ 102. On October 28, two days after the meeting, Rockey sent an email to Ear Institute Defendants "again outlining the proper and lawful procedure for billing Medicare for audiology services." *Id*. at ¶ 103; *see* Doc. 102-5 at 14 (copy of the email, which is attached to the complaint). In the email, Rockey reiterated that "[a]ny test

that is performed by an audiologist … has to be billed under their own NPI and can not [sic] be billed under the physician," but also noted that "[p]ayment will not differen[t]iate from prior payments as[] long as all audiologist[s] are set up and credentialed correctly with [M]edicare at [the] time of service."  Doc. 102-5 at 14.

On November 30, 2010, one of the Ear Institute's physicians, Richard J. Wiet, sent a letter to Medicare (actually to a private Medicare contractor, Wisconsin Physicians Service Insurance Corporation ("WPS Medicare"), but the parties agree that this wrinkle is immaterial) stating:

> We recently became aware that our audiologists were to enroll in Medicare as of October 1, 2008 and that bills for the audiologists' services should have identified their NPIs. …
>
> While we realize that the claims we have submitted for the audiologists' services since October 1, 2008 should have been submitted under the audiologists' NPIs, we do not believe that payment of these claims by WPS Medicare results in an overpayment. … [The Ear Institute] did not receive any payments from WPS Medicare that it otherwise would not have received if it had billed under the audiologists' NPIs. …
>
> I want to express my regret for this billing oversight.

Doc. 102-9 at 12-13 (copy of the letter); *see* Doc. 102 at ¶ 61.  WPS Medicare responded in a January 14, 2011 letter to Wiet, stating:

> WPS Medicare appreciates your honesty and openness about this matter. …
>
> Normally, Medicare requires providers to correct improperly filed claims, either through the Medicare Appeals process or by refunding and resubmitting the claims.  This includes situations such as yours when the overall payment will not change.  However, after discussing your situation with CMS [(the Centers for Medicare & Medicaid Services)], WPS Medicare has agreed not to require your practice to refund and resubmit the services performed by your audiologists and billed under a physician's NPI.  This concession applies only to those claims for audiology services performed by audiologists that WPS Medicare has already processed and paid.  WPS Medicare expects any such services billed after the date you discovered your billing error to be billed appropriately under the audiologist's NPI according to CMS guidelines.

Doc. 102-9 at 15 (copy of the letter); *see* Doc. 102 at ¶ 61 n.1.

Meanwhile, shortly after she sent the October 28, 2010 email, Rockey received two disciplinary write-ups: one for being late to work, and the other for failing to send bills to four patients, although sending bills to patients was not among her job duties. Doc. 102 at ¶ 106. One of the Ear Institute's physicians, Robert A. Battista, then told her that she was suspended without pay and immediately escorted her out of the office. *Id.* at ¶¶ 107-08. Battista told Rockey that she was being suspended due to her "conflict of interest" with Ear Institute Defendants regarding their Medicare billing practices. *Id.* at ¶ 108. A couple of weeks later, Rockey was fired. *Id.* at ¶ 117.

In October 2011, Rockey filed this *qui tam* action under the FCA. *See* 31 U.S.C. § 3730(b). The operative complaint alleges that Ear Institute Defendants and Trellis violated at least three provisions of the FCA: 31 U.S.C. §§ 3729(a)(1)(A), (B), and (G), the last being commonly known as the "reverse false claims" provision. Doc. 102 at ¶¶ 120-129, 138-142 (Counts 1, 2, and 4, respectively). The complaint also alleges that Ear Institute Defendants and Trellis conspired to violate one or more of those provisions, in violation of 31 U.S.C. § 3729(a)(1)(C). Doc. 102 at ¶¶ 130-137 (Count 3). Finally, the complaint alleges that Ear Institute Defendants wrongfully terminated Rockey in retaliation for having pointed out the improper billing practices, in violation of both the FCA, 31 U.S.C. § 3730(h)(1), and Illinois common law. Doc. 102 at ¶¶ 143-150 (Counts 5 and 6, respectively).

## Discussion

Before proceeding, the court notes that Congress amended relevant provisions of the FCA in 2009 and again in 2010. *See* Patient Protection and Affordable Care Act, Pub. L. 111-148 § 10104(j)(2), 124 Stat. 119, 901-02 (March 23, 2010) (amending 31 U.S.C. § 3730(e));

Fraud Enforcement and Recovery Act of 2009, Pub. L. 111-21 § 4, 123 Stat. 1617, 1621-25

(May 20, 2009) (amending 31 U.S.C. §§ 3729-33). The 2009 Act provided that it "shall take

effect on [May 20, 2009] and shall apply to *conduct* on or after the date of enactment"—except

for § 3729(a)(1)(B), which "shall take effect as if enacted on June 7, 2008, and apply to all

*claims* under the False Claims Act … that are pending on or after that date." Pub. L. 111-21

§ 4(f), 123 Stat. 1625 (emphases added).

The operative complaint is vague as to the exact timeframe of Rockey's *qui tam* claims.

But she has alleged at least some specific acts before May 20, 2009, *e.g.*, Doc. 102 at ¶ 66 (April

15, 2009), and presumably means to include conduct going back to October 1, 2008, the date that

Medicare began requiring audiologists to seek reimbursement under their own NPIs. The new

version of § 3729(a)(1)(B) unquestionably applies to Rockey's case, as her *claims* were pending

on or after June 7, 2008. But the remaining provisions that Ear Institute Defendants are alleged

to have violated—§§ 3729(a)(1)(A), (C), and (G)—apply only to *conduct* after May 20, 2009.

Any allegedly illegal conduct before that date is therefore governed by the previous versions of

those provisions.

As it happens, the old and new provisions are very similar:

| Pre-May 20, 2009 provision | Post-May 20, 2009 provision |
|---|---|
| **§ 3729(a)(1)** (2006)<br>knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval | **§ 3729(a)(1)(A)**<br>knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval |
| **§ 3729(a)(3)** (2006)<br>conspires to defraud the Government by getting a false or fraudulent claim allowed or paid | **§ 3729(a)(1)(C)**<br>conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G) |

| Pre-May 20, 2009 provision | Post-May 20, 2009 provision |
| --- | --- |
| § 3729(a)(7) (2006)<br>knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government | § 3729(a)(1)(G)<br>knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government |

31 U.S.C. §§ 3729(a)(1)(A)-(G); 31 U.S.C. §§ 3729(a)(1)-(7) (2006).  Similar, but not identical—yet Defendants do not rely on any differences in the statutory language as grounds to treat pre-May 20, 2009 conduct differently, and therefore have forfeited any such argument for purposes of their motions to dismiss.

Another preliminary matter is the pleading standard that applies to Rockey's claims.  Although Rule 8(a) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 8(a), 9(b).  "The FCA is an anti-fraud statute and claims under it are subject to the heightened pleading requirements of Rule 9(b)."  *United States ex rel. Gross v. AIDS Research Alliance-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005).  "A complaint alleging fraud must provide the who, what, when, where, and how."  *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (internal quotation marks and citation omitted).  "A principal purpose of requiring that fraud be pleaded with particularity is, by establishing this rather slight obstacle to loose charges of fraud, to protect individuals and businesses from privileged libel (privileged because it is contained in a pleading)."  *Kennedy v. Venrock Assocs.*, 348 F.3d 584, 594 (7th Cir. 2003).  Rule 9(b)'s heightened pleading standard therefore applies to Rockey's FCA *qui tam* claims, including

her conspiracy claim. *See Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 948 (7th Cir. 2013) (holding that an allegation of conspiracy to commit fraud is subject to Rule 9(b)'s heightened pleading standards); *Borsellino*, 477 F.3d at 507-08; *cf. Hoskins v. Poelstra*, 320 F.3d 761, 764 (7th Cir. 2003) (holding that Rule 9(b) does not apply to claims of conspiracy to commit non-fraudulent acts). Rule 8(a) applies to her retaliation claims under both the FCA and state law. *See United States ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1304 (11th Cir. 2010) ("Because her retaliation claim did not depend on allegations of fraud, Sanchez's complaint only needed 'a short and plain statement of the claim showing that [she was] entitled to relief.' Fed. R. Civ. P. 8(a).") (alteration in original); *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1103 (9th Cir. 2008) ("[T]he heightened pleading requirements of Rule 9(b) do not apply to FCA retaliation claims. Instead, a FCA retaliation claim must meet the Rule 8(a) notice pleading standard.").

Finally, although Rockey has organized the operative complaint's four *qui tam* counts by the relevant FCA provision, the parties' briefs are organized around Rockey's three distinct *qui tam* claims: (1) the "NPI claims," which allege that Ear Institute audiologists improperly used physician NPIs, instead of their own, on Medicare reimbursement forms; (2) the "physician order claims," which allege that the audiologists impermissibly sought and received reimbursement for services performed without a physician order; and (3) the "therapeutic claims," which allege that the audiologists impermissibly sought and received reimbursement for therapeutic services. Both categorizations are useful, and the court will use both as appropriate.

## I.  The NPI *Qui Tam* Claims Against Ear Institute Defendants (Counts 1 and 2)

Counts 1 and 2 arise under §§ 3729(a)(1)(A) and (B), respectively, which establish liability for "any person who—(A) knowingly presents, or causes to be presented, a false or

fraudulent claim for payment or approval; [or] (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. §§ 3729(a)(1)(A), (B). To the extent they are stated against Ear Institute Defendants and pertain to the NPI claims, those counts fail for two separate and independent reasons: they cannot surmount the public disclosure bar, and they fail to satisfy applicable pleading standards.

### A. Public Disclosure Bar

Ear Institute Defendants argue that the FCA's "public disclosure" bar, "which deprives courts of jurisdiction over *qui tam* suits when the relevant information has already entered the public domain through certain channels," *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 285 (2010), requires dismissal of Rockey's NPI claims under Rule 12(b)(1). *See also Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 468 (2007) (holding that the public disclosure bar is jurisdictional); *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 909 (7th Cir. 2009) (same). *Graham County*, *Rockwell*, and *Glaser* applied a prior version of the FCA, which stated in relevant part:

> *No court shall have jurisdiction* over an action under this section based upon the public disclosure of allegations or transactions … unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A) (2006) (emphasis added). In 2010, Congress amended the relevant provision to read:

> *The court shall dismiss an action or claim* under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed … unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A) (emphasis added); *see* Pub. L. 111-148 § 10104(j)(2), 124 Stat. 119, 901-02 (March 23, 2010) (amending 31 U.S.C. § 3730(e)(4)).

Although neither the Supreme Court nor the Seventh Circuit have definitively addressed this issue, the change from "[n]o court shall have jurisdiction" to "[t]he court shall dismiss" strongly suggests that the public disclosure bar is no longer jurisdictional. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 515-16 (2006) (holding that unless "the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, … courts should treat the restriction as nonjurisdictional in character"); *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 852 (7th Cir. 2012) (en banc); *Miller v. Herman*, 600 F.3d 726, 732 (7th Cir. 2010). This is especially so given that other provisions in § 3730(e) still contain the "[n]o court shall have jurisdiction" language. *See* 31 U.S.C. §§ 3730(e)(1), (e)(2)(A); *see also Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 671 (2008) ("[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal quotation marks omitted). Accordingly, the court will treat the public disclosure bar as a non-jurisdictional "claim processing rule," *see Gonzalez v. Thaler*, 132 S. Ct. 641, 648-49 (2012); *Bowles v. Russell*, 551 U.S. 205, 213 (2007)—that is, a non-jurisdictional merits issue to be handled under Rule 12(b)(6) rather than under Rule 12(b)(1). *See United States ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 706 (7th Cir. 2014) (remarking in dicta that as a result of the 2010 amendment, "it is no longer clear that *Rockwell*'s holding [that § 3730(e)(4) is jurisdictional] is still good law").

Under the FCA, a "public disclosure" includes, among other things, anything revealed "in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation." 31 U.S.C. § 3730(e)(4)(A)(ii). Governing precedent holds that "allegations have been publicly disclosed … when information about fraudulent behavior has been provided to a

competent public official … who has managerial responsibility for the very claims being made."
*Glaser*, 570 F.3d at 913 (citations and quotation marks omitted, second alteration in original);
*see United States v. Bank of Farmington*, 166 F.3d 853, 861 (7th Cir. 1999) ("disclosure to a
public official with direct responsibility for the claim in question of allegations or transactions
upon which a qui tam claim is based constitutes public disclosure within the meaning of
§ 3730(a)(4)").  Rockey does not dispute that the contents of Wiet's November 2010 letter to
WPS Medicare were publicly disclosed.  The parties disagree, however, over whether that letter
sufficiently disclosed Rockey's NPI claims.  *See Rockwell Int'l Corp.*, 549 U.S. at 476 ("Section
3730(e)(4) does not permit jurisdiction in gross just because a relator is an original source with
respect to some claim.  We, along with every court to have addressed the question, conclude that
§ 3730(e)(4) does not permit such claim smuggling.")

Ear Institute Defendants submit that Wiet's letter disclosed all pertinent information
about the NPI claims: Ear Institute audiologists obtained reimbursement for their services using a
physician's name and NPI, contrary to Medicare rules since October 1, 2008.  These disclosures,
say Ear Institute Defendants, are "substantially the same allegations or transactions as alleged in"
Rockey's NPI claims, which therefore are subject to the public disclosure bar.  31 U.S.C.
§ 3730(4)(A).  Rockey's only response is that Wiet lied in saying that Ear Institute Defendants
only "recently became aware" of the error, Doc. 102-9 at 12, and that Ear Institute Defendants'
conduct was not a "billing oversight," *id.* at 13, but rather an intentional effort to defraud
Medicare.  Any "disclosure," Rockey concludes, was therefore incomplete and misleading.
Doc. 110 at 2-4.

Ear Institute Defendants have the better of the argument.  Both parties agree that the
governing standard is provided by *United States ex rel. Springfield Terminal Railway Co. v.*

*Quinn*, 14 F.3d 645 (D.C. Cir. 1994), which holds that allegations or transactions have been publicly disclosed if "the information conveyed [to the government] could have formed the basis for a governmental decision on prosecution, or could at least have alerted law-enforcement authorities to the likelihood of wrongdoing." *Id*. at 654 (alteration in original, quotation marks omitted); *see Absher*, 764 F.3d at 707-08 (approvingly citing *Springfield Terminal Railway*'s analysis of the public disclosure bar). Wiet's letter did just that; far from being incomplete, it disclosed all of the elements necessary to show that Ear Institute Defendants had violated the new Medicare regulations. That not only comprises "substantially the same allegations or transactions as alleged in" Rockey's NPI claims, 31 U.S.C. § 3730(4)(A), but also "could … have alerted [WPS Medicare] to the likelihood of wrongdoing" on Defendants' part, *Springfield Terminal Ry.*, 14 F.3d at 654. *See Bank of Farmington*, 166 F.3d at 862 ("It may not have been the Bank's intent to confess or correct its own misrepresentation, but the effect of its action was to bring just that misrepresentation to the attention of precisely the person who should have been apprised of the information to begin with, thus effectuating the purpose of public disclosure."); *cf*. *Absher*, 764 F.3d at 708-09 (holding that the public disclosure bar did not apply to the relator's allegation that the defendant "refused to chart incidents of scabies, pressure ulcers, and rashes" because the defendant "d[id] not offer evidence that the government survey reports disclosed this misconduct").

Even though her NPI claims were publicly disclosed, Rockey may still pursue a *qui tam* action on those claims if she was an "original source" of the information. 31 U.S.C. § 3730(e)(4)(A) (providing that the public disclosure bar does not apply if "the person bringing the action is an original source of the information"). As pertinent here, an original source is someone "[1] who has knowledge that is independent of and materially adds to the publicly

disclosed allegations or transactions, *and* [2] who has voluntarily provided the information to the Government before filing an action." 31 U.S.C. § 3730(e)(4)(B) (emphasis added). Rockey alleges that her lawyer hand-delivered copies of documents describing all of her relevant knowledge to the United States Attorney's Office in Chicago before filing this lawsuit, Doc. 102 at ¶ 11, so the second requirement is satisfied. As for the first requirement, Rockey's allegation that Ear Institute Defendants were long aware of the NPI rule yet deliberately violated it, *id*. at ¶ 39, is "independent of" the publicly disclosed information; Wiet's letter did not confess that Ear Institute Defendants knowingly violated Medicare rules, but instead said that the violations were inadvertent "oversight[s]" that only "recently" had come to light.

Yet Rockey's allegation, even if true, does not "materially add[]" to the disclosures in Wiet's letter. Section 3730(e) does not define what "materially adds" means, and no federal appeals court has interpreted the phrase, which was added to § 3730(e) in 2010. *See* Pub. L. 111-148 § 10104(j)(2), 124 Stat. 119, 901-02 (March 23, 2010). But under "the usual definition" of materiality in the FCA context, "a 'statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed.'" *United States v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008) (quoting *Neder v. United States*, 527 U.S. 1, 16 (1999)) (some quotation marks and alterations omitted); *see* 31 U.S.C. § 3729(b)(4) ("For purposes of this section … the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.") Beyond reiterating that she has alleged the falsity of the letter's "recently became aware" language, Rockey makes absolutely no attempt to explain *how* this detail could have been "capable of influencing" WPS Medicare's decision regarding the NPI claims. Doc. 110 at 7. She has therefore forfeited any such argument. *See Batson v. Live Nation Entm't, Inc.*, 746 F.3d

827, 833 (7th Cir. 2014) ("[A]s the district court found, the musical diversity argument was forfeited because it was perfunctory and underdeveloped."); *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) ("We have made clear in the past that it is not the obligation of this court to research and construct legal arguments open to parties, especially when they are represented by counsel, and we have warned that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") (internal quotation marks and alterations omitted).

Rockey's position on the "materially add" issue would fail even setting aside forfeiture. Rockey's brief characterizes the Wiet letter's alleged falsity as "telling [Medicare] that [Ear Institute Defendants] '*only recently* discovered that they had been submitting claims' with the incorrect NPI numbers," when in fact "they knowingly and intentionally had been using those practices 'for at least several years.'" Doc. 110 at 7 (citing Doc. 102 at ¶ 39). But Wiet's letter made it perfectly clear that Ear Institute Defendants' *billing practices* were knowing and intentional; Wiet said, however, that he had only "recently became aware" of the fact that those practices were no longer compliant with Medicare regulations. Doc. 102-9 at 12. So Rockey's own characterization of her allegation of falsity defeats materiality, because Wiet's letter revealed the alleged falsity (submitting claims with the wrong NPI numbers) as Rockey describes it. *See United States ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 815 (11th Cir. 2015) ("[U]nder the amended statute, we conclude that Mr. Osheroff's information does not materially add to the public disclosures, which were already sufficient to give rise to an inference that the clinics were providing illegal remuneration to patients."); *United States ex rel. Paulos v. Stryker Corp.*, 762 F.3d 688, 694 (8th Cir. 2014) ("With the key facts to Dr. Paulos's FCA claims—*i.e.*, the lack of safety testing and causal connection between device and disease—

already thoroughly revealed and without any clear sense about what new information Dr. Paulos brings to the table, we cannot say his knowledge (even if gained early and independently) materially contributes anything of import to the public knowledge about the alleged fraud."); *United States ex rel. Kraxberger v. Kansas City Power & Light Co.*, 756 F.3d 1075, 1080 (8th Cir. 2014) (holding that a relator's allegations do not "materially add" to publicly disclosed allegations where the publicly disclosed allegations already "raise[d] a reasonable inference of fraud").

Rockey's only other argument regarding materiality is that the operative complaint "has also provided numerous detailed examples of Ear Institute Defendants' NPI fraud that of course nowhere appear in [Wiet's] letter." Doc. 110 at 7 (citing Doc. 102 at ¶¶ 65-69; 73-76, 80-84). Paragraphs 73-76 refer to the physician order and therapeutic claims; in the other paragraphs, Rockey alleges several specific invoices that were incorrectly billed, and she attached printouts of the relevant eClinical claims forms to her complaint. Doc. 102-4 at 21; Doc. 102-5 at 2, 6, 10; Doc. 102-6 at 18-21; Doc. 102-7 at 2-3, 7, 13-14, 19-20, 22-24; Doc. 102-8 at 1-2, 5, 8-9, 11, 13, 18-20, 22-35; Doc. 102-9 at 2. Yet Wiet's letter identified all of the "CPT codes" that were incorrectly billed—including all of the CPT codes (92541, 92543, 92544, 92545, 92552, 92556, 92557, and 92604) appearing in the attached printouts; came clean that *all* claims under those CPT codes dating back to October 1, 2008, the effective date of the new Medicare regulations, were incorrect; and offered "to provide any claim detail or additional information that WPS Medicare may require or request." Doc. 102-9 at 12-13. The isolated examples alleged in the complaint do not materially add to Wiet's comprehensive mea culpa. *See Glaser*, 570 F.3d at 920 ("It is true that Glaser's complaint adds a few allegations not covered by CMS's investigation. But this is not enough to take this case outside the jurisdictional bar[.]").

Accordingly, Rockey is not an "original source" under § 3730(e)(4)(B) and therefore cannot escape the public disclosure bar on her NPI claims.

For these reasons, the NPI claims against Ear Institute Defendants—and, for the same reasons, against Trellis as well—are dismissed.

**B.      Pleading Standards**

Even if the NPI claims were not barred by the public disclosure doctrine, they would fail to state a viable claim under the governing pleading standards.  "An FCA claim … has three essential elements: (1) the defendant made a statement in order to receive money from the government, (2) the statement was false, and (3) the defendant knew it was false." *Gross*, 415 F.3d at 604.  In addition, the false statement must be material, which means that the statement could "have influenced (or naturally tended to influence) the [government's] decision to" pay. *United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 830 (7th Cir. 2011); *see also id*. at 828 ("In light of that undisputed disclosure, no reasonable jury could think General Dynamics' failure to check the proper box in the Certification Agreement was a material false statement, as required for liability under the False Claims Act.").  As they pertain to the NPI claims, Counts 1 and 2 fail to adequately allege knowledge, falsity, and materiality.

**1.      Knowledge**

To state viable claims under §§ 3729(a)(1)(A) and (B), Rockey must plausibly allege that Ear Institute Defendants knew that their statements to Medicare were false. *See id*. at 832 ("The False Claims Act does not penalize all factually inaccurate statements, but only those statements made with knowledge of their falsity.") (internal quotation marks omitted).  The FCA defines knowledge as "actual knowledge," "deliberate ignorance of the truth or falsity," or "reckless disregard of the truth or falsity" of the relevant information.  31 U.S.C. §§ 3729(b)(1)(A)(i)-(iii). Showing that a defendant had knowledge "require[s] no proof of specific intent to defraud."  31

U.S.C. § 3729(b)(1)(B).  Rockey's allegation of knowledge is subject to the federal pleading standard as stated in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, … [m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."); *Thulin v. Shopko Stores Operating Co.*, 771 F.3d 994, 1000-01 (7th Cir. 2014).

Although Rockey repeatedly alleges that Ear Institute Defendants knowingly and deliberately billed their audiologists' services to Medicare using a physician's NPI, almost nowhere does she allege that Ear Institute Defendants knew that this practice—which was permissible prior to October 1, 2008, Doc. 102 at ¶ 36—was no longer allowed.  Rockey's only concrete allegation regarding Ear Institute Defendants' knowledge of the practice's impropriety is that *she* alerted them to the problem in the October 26, 2010 office meeting, and again in her October 28 email.  Doc. 102 at ¶¶ 102-103.  If that is the first that Ear Institute Defendants learned of the problem, then their coming clean to Medicare on November 30—having in the interim enrolled their five audiologists in Medicare, obtained NPI numbers for them, and held "multiple phone conversations with representatives in WPS Medicare's Provider Enrollment section," Doc. 102-9 at 13—compels the conclusion that the billing error really was an oversight that they worked diligently to remedy.

Rockey responds by citing the complaint's allegation in ¶ 102 that "Defendants acknowledged and admitted to Ms. Rockey [in the October 26 meeting] that they were well aware that their actions were improper, explaining that they had been submitting those fraudulent claims at the suggestion of their accountant because it would allow them to collect more money from Medicare."  Doc. 102 at ¶ 102 (capitalization normalized).  Rockey's own October 28 email, which she attached to her complaint, Doc. 102-5 at 14, belies this allegation's plausibility.

The email, which bears the subject line "PER YOUR REQUEST," states that one of the Ear Institute Defendants "asked [Rockey] to type out and submit via email the information that was given to you … in our [October 26] meeting." *Ibid.* If, as the complaint alleges, Ear Institute Defendants were already "well aware" of the NPI regulations, why would they need her to describe them in an email? Moreover, Rockey wrote in the email: "Payment will not differen[t]iate from prior payments as[] long as all audiologist[s] are set up and credentialed correctly with [M]edicare at [the] time of service." *Ibid.* How could Ear Institute Defendants "collect more money from Medicare"—which ¶ 102 alleges was their motive—by using the wrong NPIs if, had they used the correct NPIs, "[p]ayments w[ould] not differ[]"? More to the point, why would they knowingly choose to violate a regulation that would have cost them nothing to follow?

On a motion to dismiss, the court must, to be sure, draw all inferences in Rockey's favor. But given all this, particularly the October 28 email, the complaint's allegation in ¶ 102 that Ear Institute Defendants knew before the October 26 meeting they were violating the new Medicare regulations is implausible. *See Forrest v. Universal Sav. Bank, F.A.*, 507 F.3d 540, 542 (7th Cir. 2007) ("Where an exhibit and the complaint conflict, the exhibit typically controls. A court is not bound by the party's characterization of an exhibit and may independently examine and form its own opinions about the document.") (citation omitted).

Although the analysis could stop there, it bears mention that the allegation of knowledge in ¶ 102 is at odds with the remainder of the complaint. Rockey repeatedly uses words like "improper," "fraudulent," "false," and "illegal" to describe Ear Institute Defendants' knowing use of a physician's NPI instead of the treating audiologist's NPI—but not to allege that Ear Institute Defendants *also* knew that this practice had come to violate Medicare rules. For example, ¶ 70 alleges: "Defendants had *specific knowledge of these illegal, fraudulent, and*

*improper* practices.  Indeed, [Ear Institute] Defendants instructed and trained Ms. Rockey to make the changes in eClinical *knowing that the Defendant Physicians were not the Rendering Providers* and that such false claims would be submitted to Medicare."  Doc. 102 at ¶ 70 (emphases added, capitalization normalized).  In other words, the "specific knowledge of these illegal, fraudulent, and improper practices" alleged in ¶ 70 is demonstrated only by Ear Institute Defendants' "knowing that the Defendant Physicians were not the Rendering Providers"—not by their knowing about the new regulations.

Likewise, ¶ 38 alleges: "Defendants operated their *fraudulent scheme* by submitting claims to Medicare using the NPI of a Defendant Physician, even though a Defendant Audiologist, not enrolled in Medicare and *without* a valid NPI, had performed the service, and even though the Defendant Physician performed no services for the patient at all."  *Id.* at ¶ 38 (capitalization normalized, first emphasis added).  The "fraudulent scheme" referenced in ¶ 38 is merely Ear Institute Defendants' using the physician's NPI as permitted by the old Medicare rule, with nary an allegation that they were *aware* of the new Medicare rule.  Indeed, ¶¶ 63-69 list, by Rockey's own description, "examples of specific false records and claims Defendants[] fraudulently submitted to Medicare for reimbursement," Doc. 102 at ¶¶ 63-69 (capitalization normalized)—even though those examples do not include any allegation that Ear Institute Defendants also *knew* that substituting the NPIs in these cases violated Medicare regulations.

In sum, the operative complaint, while littered with vague and conclusory uses of "improper," "fraudulent," "false," and "illegal," Doc. 102 at ¶¶ 10, 38, 57, 59-61, 70, 88-90, 115, does not plausibly allege that Ear Institute Defendants acted with the knowledge that their conduct violated the new Medicare regulations.  An unknowing regulatory violation does not satisfy the knowledge element of an FCA *qui tam* claim.  *See United States ex rel. Grenadyor v.*

*Ukrainian Vill. Pharmacy, Inc.*, 772 F.3d 1102, 1107 (7th Cir. 2014) ("[I]t is not enough to allege, or even prove, that the pharmacy engaged in a practice that violated a federal regulation. Violating a regulation is not synonymous with filing a false claim."); *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1020 (7th Cir. 1999) ("[T]he FCA is not an appropriate vehicle for policing technical compliance with administrative regulations."). Rockey's failure to provide any plausible basis for believing that Ear Institute Defendants knew *before* October 26, 2010 that their once legitimate billing practices were no longer kosher— despite her having had the opportunity to file three different complaints—demonstrates that no such basis exists. *See Grenadyor*, 772 F.3d at 1108 ("And if [the relator] can't allege how he learned that the charges had not been reversed, what basis has he for alleging they were never reversed?"); *Lamers*, 168 F.3d at 1018 ("Lamers provided no credible evidence that the City intended to flout the regulations from the very beginning.").

The operative complaint's only other allegations bearing on Ear Institute Defendants' knowledge assert that Ear Institute Defendants "kn[ew] for at least several years that they were required to" obtain NPIs for their audiologists, and that "[t]he law and Regulations were knowingly and intentionally disregarded." Doc. 102 at ¶¶ 39-40. Those allegations are conclusory and, as noted above, unsupported by any factual averments in these or any other paragraphs of the complaint. *See Thulin*, 771 F.3d at 1000 (holding that under the FCA, "vague allegations that a corporation acted with reckless disregard … [of falsity] simply by virtue of its size, sophistication, or reach do not clear even th[e] lower pleading threshold" of Rule 8(a)); *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) ("We have interpreted *Twombly* and *Iqbal* to require the plaintiff to 'provid[e] some specific facts' to support the legal claims asserted in the complaint.") (alteration in original).

## 2. Falsity

To adequately plead falsity, Rockey must plausibly allege that Ear Institute Defendants either presented "a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or "knowingly ma[de] … a false record or statement material to a false or fraudulent claim," § 3729(a)(1)(B). "[E]rrors based simply on faulty calculations or flawed reasoning," "innocent mistakes," or "negligence" are not "false" under the FCA. *Lamers*, 168 F.3d at 1018. According to the Seventh Circuit, "it is impossible to meaningfully discuss falsity without implicating the knowledge requirement." *Ibid*. For the same reasons that Rockey has not plausibly alleged that Ear Institute Defendants knew about the new NPI regulation and violated it anyway, she has also failed to plausibly allege that the NPI claims were anything but negligent or "innocent mistakes."

Alternatively, Rockey asserts that the NPI claims were what she calls "legally false." On this theory, Ear Institute Defendants' signing a Medicare Electronic Data Interchange Agreement ("EDIA") form, which certified that "the claims submitted are accurate, complete, and truthful," Doc. 102 at ¶¶ 21-28, rendered the NPI claims false as a matter of law. Rockey concedes that this type of "certification liability" attaches only if the certification is a condition of payment. Doc. 109 at 11; Doc. 110 at 14; *see Gross*, 415 F.3d at 604 ("An FCA claim premised upon an alleged false certification of compliance with statutory or regulatory requirements also requires that the certification of compliance be a condition of or prerequisite to government payment."). Trellis attached a copy of the EDIA certification to its brief, Doc. 104-1 at 18-21, and because Rockey specifically references the certification form in her complaint, Doc. 102 at ¶¶ 26-28— and because it is central to her "certification liability" argument—the court may consider it on a motion to dismiss. *See Geinosky*, 675 F.3d at 745 n.1.

Executed by Battista on behalf of the Ear Institute in May 2008, the EDIA form indeed certifies that the Ear Institute "will submit claims that are accurate, complete, and truthful." Doc. 104-1 at 18, ¶ 7. The claim forms' only alleged falsity is that a doctor, not the treating audiologist, was listed as the "Rendering Provider." Yet this practice was, as noted, long permitted by Medicare, so it is unrealistic to call it false or untruthful. *See Gross*, 415 F.3d at 604 ("[T]he existence of mere technical regulatory violations tends to undercut any notion that a prior representation of regulatory compliance was knowingly and falsely made in order to deceive the government."). Nothing in the EDIA form imposes strict liability for technical regulatory noncompliance; to the contrary, it contains provisions dealing with how to handle inadvertent inaccuracies in submitted claims. Doc. 104-1 at 18, ¶ 5 (providing for governmental audits and procedures for how to "adjust" any "incorrect payments"); *id*. at 19, ¶ 14 (imposing a duty on the Ear Institute to "research and correct claim discrepancies").

The Tenth Circuit discussed the "certification liability" theory in a Medicare case in which the certification form read: "I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations." *United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1219 (10th Cir. 2008) (quoting 42 C.F.R. § 413.24(f)(4)(iv)). Declining to hold the defendant liable under the FCA for its technical noncompliance with Medicare regulations, the Tenth Circuit explained:

> Although this [Medicare] certification represents compliance with underlying laws and regulations, it contains only general sweeping language and does not contain language stating that payment is conditioned on perfect compliance with any particular law or regulation. Nor does any underlying Medicare statute or regulation provide that payment is so conditioned. Thus, by arguing that the certification's language is adequate to create an express false certification claim, Conner fundamentally contends that *any* failure by [the defendant] to comply with *any* underlying Medicare statute or regulation

during the provision of *any* Medicare-reimbursable service renders this
certification false, and the resulting payments fraudulent.

*Ibid*. *Conner* rejected the plaintiff's contention, and its rationale is persuasive. The same

rationale applies here. *See Grenadyor*, 772 F.3d at 1105 (holding that the defendants had not

made a "false" statement by signing a certification form stating, "I agree to abide by the

Medicare laws, regulations and program instructions that apply to this supplier," reasoning that

"[i]t may have been an honest statement of intentions at the time, followed by a change of heart,

motivated perhaps by greed …—and in that case the pharmacy would not have made any false

statements, but simply have billed Medicare when it shouldn't have").

Rockey urges the court to ignore the EDIA form because it might not "govern[] the

entirety of [Ear Institute Defendants' and Trellis's] relationship to Medicare, CMS, or even [each

other]." Doc. 109 at 10. Maybe—but if Rockey is going to allege that other agreements may

give rise to liability for fraud, it is her job to identify those agreements with particularity. After

all, Rule 9(b) "requires the plaintiff to conduct a precomplaint investigation in sufficient depth to

assure that the charge of fraud is responsible and supported." *Cincinnati Life Ins. Co.*, 722 F.3d

at 950 (quotation marks omitted). Rockey's suggestion that other agreements may exist, and that

Defendants might have committed fraud by violating the terms of those hypothetical agreements,

amounts to nothing more than rank speculation.

### 3.    Materiality

Even assuming Rockey has plausibly alleged knowledge and falsity, her NPI claims

would still founder on materiality. Rockey agrees that to state a claim under the FCA, she must

allege not only that Ear Institute Defendants' claims were knowingly false, but also that the

falsehoods were material to the government's decision to pay the claims. Doc. 110 at 15-17; *see*

*Yannacopoulos*, 652 F.3d at 828; *Rogan*, 517 F.3d at 452; *Luckey v. Baxter Healthcare Corp.*,

183 F.3d 730, 732-33 (7th Cir. 1999). Section 3729(b) defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). Materiality is measured by an objective standard. *See Rogan*, 517 F.3d at 452.

As discussed above, Rockey's NPI claims are limited to those for which Medicare would have reimbursed the Ear Institute even if the audiologists' NPIs had been listed on the claims forms. Thus, Ear Institute Defendants' failure to use the correct NPI could not have "influence[d] the payment or receipt of money" by the government because the government would have paid the claim regardless of whose NPI was on the form. It follows that the alleged falsity of those claims was not material. *See Yannacopoulos*, 652 F.3d at 828 ("General Dynamics' failure to check the proper box in the Certification Agreement was [not] a material false statement, as required for liability under the False Claims Act."); *Conner*, 543 F.3d at 1219-20 ("If the government would have paid the claims despite knowing that the contractor has failed to comply with certain regulations, then there is no false claim for purposes of the FCA.").

It is true that WPS Medicare stated that the government granted the Ear Institute a "concession" in light of Wiet's "honesty and openness." Doc. 102-9 at 15. If Wiet had not been honest and open, his letter to WPS Medicare could have been "capable of influencing" the government's decision to grant that concession. But WPS Medicare's "concession" was merely to relieve Ear Institute Defendants of the burden of refunding all of the payments and then resubmitting the same claims using the correct NPIs—which Medicare would then have been obliged to pay. In other words, the concession was simply to avoid needless paperwork; as WPS Medicare's letter itself noted, "the overall payment will not change," *ibid.*, which means that the alleged falsity did not influence the "payment or receipt of *money*." 31 U.S.C. § 3729(b)(4)

(emphasis added); *see Gross*, 415 F.3d at 605 ("False claim allegations must relate to actual money that was or might have been doled out by the government based upon actual and particularly-identified false representations.").

## II. The Physician Order and Therapeutic *Qui Tam* Claims Against Ear Institute Defendants (Counts 1 and 2)

Ear Institute Defendants next challenge Rockey's "physician order" and "therapeutic" claims. As discussed, Medicare covers diagnostic audiology services performed by an audiologist only if ordered by a physician, and will not cover therapeutic audiology services performed by an audiologist at all. *Medicare Benefit Policy Manual*, *supra*, at ch. 15, §§ 80.3(B), (F); *see* Doc. 102 at ¶¶ 30, 91. By submitting its audiologists' claims using a physician's name and NPI, says Rockey, Ear Institute Defendants were reimbursed for services that were not reimbursable.

Ear Institute Defendants concede that the physician order and therapeutic claims are not precluded by the public disclosure bar. Doc. 105 at 8 n.11. And Rockey has alleged enough to survive a motion to dismiss on those claims. Regarding the physician order claims, the operative complaint plausibly alleges that new patients could schedule appointments to be seen by the Ear Institute's audiologists, and could receive audiology services from the audiologists, all without a physician's order or referral. Doc. 102 at ¶¶ 95-97. The complaint also plausibly alleges that, had there been a physician order, it would have been noted in the patient files—yet Rockey never saw any. *Id.* at ¶¶ 96, 99-100. Regarding the therapeutic claims, the complaint plausibly alleges that Rockey personally changed the claims forms for therapeutic services provided by audiologists, and that she overheard the Ear Institute's audiologists discussing therapeutic services that they provided to patients and then billed to Medicare. *Id.* at ¶¶ 73-76.

True, Rockey does not allege any specific instances of these kinds of false claims. But the Seventh Circuit has held that it is not "essential for a relator to produce the invoices (and accompanying representations) at the outset of the suit." *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854 (7th Cir. 2009); *see* Note, "Linking Rule 9(b) Pleading and the First-To-File Rule to Advance the Goals of the False Claims Act," 108 *Nw. U. L. Rev.* 1423, 1427-28 (2014) (describing a circuit split as to whether a relator must attach a "particular fraudulent invoice" to her complaint, and noting that the Seventh Circuit falls on the "permissive side of the spectrum"). Rule 9(b)'s particularity requirement exists "so that opposing parties can respond effectively, and the trial judge can set an appropriate course for the litigation process." *Cincinnati Life Ins. Co.*, 722 F.3d at 949. That is the case here: Rockey describes in detail exactly what those kinds of claims forms would look like, Doc. 102 at ¶¶ 76-77, 100-101, and plausibly alleges that those documents "are in Defendants' sole possession, custody and control," *id*. at ¶ 77; *see also id*. at ¶ 101, making dismissal inappropriate.

## III. Counts 1 and 2 Against Trellis

Counts 1 and 2 in their entirely do not satisfy the governing pleading standards against Trellis because Rockey has failed to allege materiality or that Trellis "knowingly" presented "false" claims. (The NPI claims would fail anyway under the public disclosure bar.) In fact, the case for dismissal as to Trellis is even stronger, for Rockey's only allegation regarding its knowledge is that "sometime in the summer of 2010," she told a Trellis employee about Ear Institute Defendants' practice of using a physician's NPI instead of the treating audiologist's. Doc. 102 at ¶¶ 58-59. But according to the operative complaint, the employee responded that "Trellis was unaware" that Ear Institute Defendants were doing that. *Ibid*. Rockey does not

allege that she discussed the applicable Medicare regulation with the Trellis employee; nor does she allege that she even *mentioned* the physician order or therapeutic claims to the employee.

Rockey goes on to allege, in conclusory fashion, that Trellis knew all along that Ear Institute Defendants were substituting the NPIs on the claims forms or, at best, "buried their head in the sand … by failing to make appropriate inquiry." *Id.* at ¶ 60. But Rockey's brief provides no authority to support the claim that Trellis had an affirmative legal duty to investigate Ear Institute Defendants' behavior. In fact, the EDIA form makes clear that *Ear Institute Defendants* "will be responsible for all Medicare claims submitted to CMS … by itself, its employees, *or its agents*." Doc. 104-1 at 18, ¶ 1 (emphasis added). Trellis was indisputably Ear Institute Defendants' agent in this respect, and Rockey has not plausibly alleged that its passive role in submitting the reimbursement claims forms based on the information its principal provided was anything worse than negligent. In any event, even if this conclusion were wrong, the NPI claims are nonetheless defeated by the public disclosure bar, and the physician order and therapeutic claims would fail because of the dearth of allegations tying Trellis to those claims.

## IV. Reverse False Claims (Count 4)

Rockey alleges that Ear Institute Defendants and Trellis also violated the FCA's "reverse false claims" provision, 31 U.S.C. § 3729(a)(1)(G), which condemns "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceal[ing] or knowingly and improperly avoid[ing] or decreas[ing] an obligation to pay or transmit money or property to the Government." Rockey asserts that "all of their submissions for payment of claims" violated that provision because Ear Institute Defendants "failed to take out or reimburse the Government for prior false claims." Doc. 102 at ¶ 141. But this is merely a repackaged version of Counts 1

and 2, and so does not state a plausible claim for relief against either Ear Institute Defendants (as to the NPI claims) or Trellis (as to all claims).

Rockey contends that Wiet's November 2010 letter to WPS Medicare violated the reverse false claims provision because it "intentionally and fraudulently misrepresented [Ear Institute Defendants'] conduct affirmatively and by omission." *Ibid*. Rockey does not allege that Trellis played any part in sending the letter, so it cannot form the basis of liability against Trellis. Ear Institute Defendants for their part argue that reverse false claims liability arises only where the defendant makes a false statement *at the time* it owes an obligation to the government. Doc. 105 at 19. Several circuits have imposed this "contemporaneity" requirement on reverse false claims. *See United States ex rel. Matheny v. Medco Health Sol'ns, Inc.*, 671 F.3d 1217, 1223 (11th Cir. 2012); *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 473 (6th Cir. 2011); *United States ex rel. Vigil v. Nelnet, Inc.*, 639 F.3d 791, 802 (8th Cir. 2011). Under that requirement, a relator who "merely allege[s] that [the defendant] is obligated to repay all payments it received from the government" has not stated a claim for relief under the reverse false claims provision. *Chesbrough*, 655 F.3d at 473.

It is doubtful that a contemporaneity requirement, if in fact it existed, survived the amendment to the reverse false claims provision. The old version of the statute imposed liability for "knowingly mak[ing] … a false record or statement *to* conceal, avoid, or decrease an obligation." 31 U.S.C. § 3729(a)(7) (2006) (emphasis added). The phrase "to conceal" implies a purpose or intent, just as the "to get" language did in former § 3729(a)(2) ("knowingly makes … a false record or statement *to get* a false or fraudulent claim paid") (emphasis added). *See Allison Engine Co.*, 553 U.S. at 668-69 ("'To get' denotes purpose, and thus a person must have the purpose of getting a false or fraudulent claim 'paid or approved by the Government' in order

to be liable under § 3729(a)(2).") (brackets omitted). Contemporaneity was likely tied to

purpose, for how could a fraudster have the purpose to conceal a non-existent obligation? But

the phrase "to conceal" disappeared from the reverse false claims provision, which now imposes

liability for "knowingly mak[ing] … a false record or statement *material to* an obligation to pay"

the government. 31 U.S.C. § 3729(a)(1)(G) (emphasis added).

The issue is academic, however, because Ear Institute Defendants never had an

"obligation" to the government on the NPI claims. The amended statute defines "obligation" to

include "the retention of any overpayment" by the government. 31 U.S.C. § 3729(b)(3). The

NPI claims, however, did not result in any overpayment, as the government would have made the

payments even had the correct NPIs been listed. Ear Institute Defendants therefore could not

have violated § 3729(a)(1)(G), because no statement, false or otherwise, can be "material to" a

nonexistent obligation. Count 4 is therefore dismissed as to the NPI claims.

By the same token, the physician order and therapeutic claims, per Rockey's allegations,

*did* result in overpayments. And those alleged overpayments would have been made long before

the November 2010 letter—thereby satisfying even the contemporaneity requirement, if it still

exists. The reverse false claims provision also requires the defendant's statement to be

objectively false. *See Yannacopoulos*, 652 F.3d at 838 ("To establish a reverse false claim, [the

relator] must first show that [the defendants' statement] was objectively false in some way.").

Rockey says that Wiet's letter misleadingly omitted any mention of the physician order and

therapeutic claims; in fact, it affirmatively stated that the Ear Institute "did not receive any

payments from WPS Medicare that it otherwise would not have received if it had billed under the

audiologists' NPIs." Doc. 102-9 at 13. Taking Rockey's allegations about the physician order

and therapeutic claims as true, this statement in Wiet's letter is objectively false. And so the

letter could plausibly be construed as "a false … statement material to an obligation to pay" the government, in violation of § 3729(a)(1)(G).

Accordingly, Count 4 is dismissed except as to the physician order and therapeutic claims against Ear Institute Defendants.

## V.     FCA Conspiracy Claim (Count 3)

Rule 9(b) governs Rockey's conspiracy claim under 31 U.S.C. § 3729(a)(1)(C).  *See Cincinnati Life Ins. Co.*, 722 F.3d at 948; *Borsellino*, 477 F.3d at 507-08.  "[G]eneral civil conspiracy principles apply" to FCA conspiracy claims.  *United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 545 n.3 (7th Cir. 1999).  "A civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act *that results* in damage."  *Lenard v. Argento*, 699 F.2d 874, 882 (7th Cir. 1983) (internal quotation marks omitted, emphasis added).  The italicized phrase is crucial, for it means that unlike criminal conspiracy, a civil conspiracy requires both an overt act and a resulting injury.  *See ibid.*; *cf. United States v. Feola*, 420 U.S. 671, 687 (1975) (holding that a criminal "conspiracy to commit [an] offense is nothing more than an agreement to engage in the prohibited conduct"); *United States v. Saybolt*, 577 F.3d 195, 202 (3d Cir. 2009) (holding that 18 U.S.C. § 286, the criminal false claims statute, does not require a showing of any overt act).  Put differently, an actionable FCA conspiracy exists only where at least one of the alleged co-conspirators actually committed an FCA violation.  *See United States ex rel. Farmer v. City of Houston*, 523 F.3d 333, 343 (5th Cir. 2008) (holding that an FCA relator "must demonstrate that defendants shared a specific intent to defraud the Government") (internal quotation marks and brackets removed).

Because Rockey has failed to state a claim for relief on her NPI claims on Counts 1, 2, and 4, the conspiracy allegation regarding those claims also fails. The same holds for the physician order and therapeutic claims against Trellis, though for a different reason: Rockey has failed to allege the existence of an agreement between Trellis and Ear Institute Defendants regarding those claims; as noted earlier, she has not even adequately alleged that Trellis *knew* that Ear Institute Defendants were committing those violations. *See Durcholz*, 189 F.3d at 546.

So the only viable conspiracy claim is against Ear Institute Defendants on the physician order and therapeutic claims. Ear Institute Defendants have not argued whether they are even capable of conspiring among themselves, given that all of the individual physicians and audiologists were indisputably acting as employee-agents of, and within the scope of their employment with, the Ear Institute. *Cf. Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769 (1984) ("[O]fficers or employees of the same firm do not provide the plurality of actors imperative for a [Sherman Act] conspiracy."); Shaun P. Martin, "Intracorporate Conspiracies," 50 *Stan. L. Rev.* 399, 411 (1998) ("[B]ecause the acts of a corporate agent are the acts of the corporation, no plurality of autonomous agents exists when wholly intracorporate conduct is at issue. This theory posits that internal corporate discussions cannot give rise to corporate liability for conspiracy because only the actions of one entity—the corporation, acting through its agents—is alleged. The federal judiciary has adopted this 'single entity' view of intracorporate agreements in a variety of civil settings.") (footnotes and paragraph break omitted). Ear Institute Defendants have therefore forfeited the argument for purposes of this motion to dismiss. *See G&S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) ("We have repeatedly held that a party waives an argument by failing to make it before the district court. That is true whether it is an affirmative argument in support of a motion to dismiss

or an argument establishing that dismissal is inappropriate.") (citations omitted). The motion accordingly is denied as to the conspiracy count against Ear Institute Defendants on the physician order and therapeutic claims.

## VI.    FCA Retaliation Claim (Count 5)

Rockey alleges that Ear Institute Defendants fired her in violation of the FCA's anti-retaliation provision, which imposes liability for discharging an employee "because of lawful acts done by the employee … in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h)(1). The provision protects employees' "collecting information about a possible fraud, before they have put all the pieces of the puzzle together." *Fanslow v. Chicago Mfg. Ctr., Inc.*, 384 F.3d 469, 481 (7th Cir. 2004). "[T]he statute covers investigations that, although reasonable in prospect, do not pan out and thus do not lead to actions under the False Claims Act." *Lang v. Nw. Univ.*, 472 F.3d 493, 494 (7th Cir. 2006). "The statute does not, however, protect an employee who just imagines fraud without proof." *Fanslow*, 384 F.3d at 481.

Ear Institute Defendants argue that Rockey has not alleged that she engaged in any conduct "in furtherance of an action" under the FCA. Doc. 105 at 19-22.[*] In response, Rockey points to ¶¶ 144-146 of the operative complaint. Doc. 110 at 24. But those paragraphs simply state, in conclusory fashion, the elements of a retaliation claim under the FCA. Doc. 102 at ¶¶ 144-146.

---

[*] Before 2009, the FCA provided that "in furtherance of an action under this section" included "investigation for, initiation of, testimony for, or assistance in an action filed or to be filed." 31 U.S.C. § 3730(h) (2006); *see* Pub. L. 111-21, 123 Stat. 1624-25 (May 20, 2009). That language is absent from the current version of the statute, which applies to Rockey's suit. Neither Ear Institute Defendants nor Rockey, however, suggest that this deletion changed the meaning of "in furtherance of an action," so the court will seek guidance from both pre- and post-2009 case law.

Rockey also cites ¶¶ 102-108 of the complaint, which describe the October 26, 2010 meeting, the October 28 follow-up email, and details about her firing as evidence that she engaged in "protected activity" under the FCA.  Doc. 110 at 24.  But her alleged conduct was not "in furtherance of an action" under the FCA.  Almost exactly on point is *Brandon v. Anesthesia & Pain Management Associates, Ltd.*, 277 F.3d 936 (7th Cir. 2002):

> What exactly had Brandon done that could have been seen as protected conduct or a "precursor to [FCA] litigation?"  He had notified the shareholders that he was concerned about their billing practices.  He had contacted Medicare for information about Medicare billing rules.  But were any of these actions "in furtherance of" a *qui tam* action?  Did any of these actions put APMA on notice of the "distinct possibility" of a *qui tam* action?  Under the circumstances here, we cannot find that APMA would have realized that it faced the "distinct possibility" of such an action.  It is true that Brandon used terms like "illegal," "improper," and "fraudulent" when he confronted the shareholders about the billing practices.  On the other hand, Brandon had never explicitly told the shareholders that he believed they were violating the FCA and had never threatened to bring a *qui tam* action.  He never threatened to report their conduct to the government until after he was discharged.  Brandon was simply trying to convince the shareholders to comply with the Medicare billing regulations.  Such conduct is usually not protected by the FCA.

*Id.* at 944-45 (citations omitted).  Rockey alleges nothing more than that she, too, merely "notified [Ear Institute Defendants] that [s]he was concerned about their billing practices," and "was simply trying to convince [Ear Institute Defendants] to comply with the Medicare billing regulations."  *Ibid*.  Rockey never alleges that she told Ear Institute Defendants "that [s]he believed they were violating the FCA," or that she ever "threatened to bring a *qui tam* action."  *Ibid*.  Ignoring Ear Institute Defendants' citations to *Brandon*, Doc. 105 at 20-21, Rockey does not even attempt to explain how her case is distinguishable, Doc. 110 at 24-25.

That said, Rockey does argue that her actions comprised "efforts to stop 1 or more violations" of the FCA.  *Ibid*.  In *Halasa v. ITT Educational Services, Inc.*, 690 F.3d 844 (7th Cir. 2012), the Seventh Circuit stated: "In 2009, Congress amended the statute to protect

employees from being fired for undertaking 'other efforts to stop' violations of the Act, *such as reporting suspected misconduct to internal supervisors*." *Id.* at 847-48 (emphasis added). This statement may be dicta, given that the Seventh Circuit immediately followed it with: "For the purposes of this appeal, we proceed on the assumption that Halasa's conduct falls within the scope of the statute's amended language." *Id.* at 848. Yet it is persuasive, especially given Rockey's position within the company: what more can a lower-level employee like Rockey realistically do to stop a potential FCA violation than report it to a supervisor? Accordingly, Rockey's FCA retaliation claim survives dismissal.

Ear Institute Defendants might have argued that Rockey's retaliation claim is untenable because she has not adequately alleged an FCA *qui tam* violation on the NPI claims, and so, the argument would go, her reporting the NPI-related "misconduct" to Ear Institute Defendants is irrelevant, for her efforts could not have stopped a plausible violation of the FCA. And nowhere does the complaint state that she reported to Ear Institute Defendants any alleged misconduct related to the physician order or therapeutic claims. But Ear Institute Defendants do not make these arguments, Doc. 105 at 19-22; Doc. 111 at 22-23, and so they are forfeited for purposes of this motion to dismiss. *See G&S Holdings*, 697 F.3d at 538.

## VII.    State Law Retaliatory Discharge Claim (Count 6)

Rockey also brings a state law retaliatory discharge claim. Illinois is an at-will employment state, meaning that, as a general rule, "an employer may discharge an employee … for any reason or for no reason." *Turner v. Mem'l Med. Ctr.*, 911 N.E.2d 369, 374 (Ill. 2009) (internal quotation marks omitted); *see also Brandon*, 277 F.3d at 940. The Supreme Court of Illinois "has recognized the limited and narrow tort of retaliatory discharge as an exception to the general rule of at-will employment." *Jacobson v. Knepper & Moga, P.C.*, 706 N.E.2d 491, 492 (Ill. 1998). "To state a valid retaliatory discharge cause of action, an employee must allege that

(1) the employer discharged the employee, (2) in retaliation for the employee's activities, and (3) that the discharge violates a clear mandate of public policy."  *Turner*, 911 N.E.2d at 374; *see also Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 628 (7th Cir. 2009); *Blount v. Stroud*, 904 N.E.2d 1, 9 (Ill. 2009); *Palmateer v. Int'l Harvester Co.*, 421 N.E.2d 876, 877-78 (Ill. 1981).

Ear Institute Defendants argue that because the FCA's anti-retaliation provision provides an adequate remedy for Rockey, she is precluded from pursuing a state law retaliatory discharge claim.  Doc. 105 at 23 & n.17; Doc. 111 at 23.  In support, they cite only *United States ex rel. Chandler v. Hektoen Institute for Medical Research*, 35 F. Supp. 2d 1078 (N.D. Ill. 1999), which observed that "Illinois courts would not expand the tort of retaliatory discharge to this case because the remedies embodied in the FCA serve as an adequate deterrent to future employer misconduct."  *Id.* at 1083.  The Seventh Circuit's decision in *Brandon*, however, undermines that portion of *Chandler*:

> But the existence of government-imposed criminal and civil sanctions for unlawful conduct cannot be the basis for inferring that an employee cannot state a claim for retaliatory discharge when the employer fires her in retaliation for reporting the unlawful conduct.  In most "whistle-blower" retaliatory discharge claims, the employee is objecting to conduct by her employer that carries criminal or civil sanctions.  If the district court's view were correct, the whole "citizen crime-fighter" species of retaliatory discharge claim would become extinct in Illinois.  We see nothing in the scraps of language from other courts that would support such an important shift in Illinois law, and the Illinois Supreme Court itself has never taken such a step.

277 F.3d at 943 (citation omitted); *see also Jacobson*, 706 N.E.2d at 493 (holding that a retaliatory discharge claim is viable "when an employee is discharged in retaliation for the reporting of illegal or improper conduct, otherwise known as 'whistle blowing'") (citing *Palmateer*); *Darchak*, 580 F.3d at 628-29 (same).  In light of *Brandon*, *Chandler*'s alternative-remedy rationale is not a valid reason for dismissing Rockey's state law retaliation claim.  *See*

*United States ex rel. Geschrey v. Generations HealthCare, LLC*, 2013 WL 1828070, at \*2 (N.D. Ill. Mar. 22, 2013) (reaching the same conclusion after analyzing *Brandon* and *Chandler*).

Ear Institute Defendants argue that *Brandon* is inapposite because there "it was 'unclear' whether plaintiff's activity fell within the FCA's anti-retaliation provision," while here it is clear that the FCA "will support a retaliatory discharge claim … [where] a plaintiff makes an internal report of fraud." Doc. 111 at 23. And indeed, this court declined to dismiss Rockey's § 3730(h) claim in part because *Halasa*'s dicta (that "reporting suspected misconduct to internal supervisors" may be protected under the amended FCA, 690 F.3d at 847-48) is persuasive. Persuasive, but not binding; maybe this court has guessed wrong about what the Seventh Circuit would do when squarely presented with the issue. So, as in *Brandon*, whether the FCA provides Rockey with an adequate remedy remains "unclear," and thus her possibly valid FCA retaliation claim is an insufficient ground on which to dismiss her state law retaliation claim. Ear Institute Defendants make no other arguments in favor of dismissal, and so the claim survives.

## Conclusion

Trellis's motion to dismiss is granted, as is Ear Institute Defendants' motion to dismiss Counts 1 through 4 as to the NPI claims. Those claims are dismissed with prejudice; in granting Relators leave to file their second amended complaint rather than requiring them to respond to the motion to dismiss the first amended complaint, the court stated that it would be their "last and best opportunity to amend." *See Bogie v. Rosenberg*, 705 F.3d 603, 608 (7th Cir. 2013) ("When a complaint fails to state a claim for relief, the plaintiff should ordinarily be given an opportunity, at least upon request, to amend the complaint to correct the problem if possible."). Ear Institute Defendants' motion to dismiss is denied on Counts 1 through 4 as to the physician order and therapeutic claims, and also on Counts 5 and 6.

March 25, 2015

_____
United States District Judge